UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RODNEY SIMINGTON and SHARON SIMINGTON, d/b/a Paintball Uphoria, and AKHTAR ZAMIR, d/b/a Norwalk Smoke Shop, on behalf of themselves and all others similarly situated, | Case No. 10-cv-6052 (KMBHIERS) |
| Plaintiffs, | SECOND AMENDED CLASS ACTION COMPLAINT |
| vs. | |
| LEASE FINANCE GROUP, LLC; NORTHERN LEASING SYSYEMS, INC.; GLOBAL LEASING COMPANY, INC.; JAY COHEN; LEONARD MEZEI; SARA KRIEGER; NORTH AMERICAN BANCARD SYSTEMS, LLC; and PAYMENT SYSTEMS INC., | Demand For Jury Trial |
| Defendants. | |

## INTRODUCTION

1.      This is a nationwide class action seeking compensatory damages, restitution, disgorgement, and injunctive relief arising from a fraudulent scheme involving merchant card services and associated equipment leasing.  Merchant card services enable an individual or a business to accept and process credit card payments; users of such services typically also need to lease or buy credit card processing equipment.  Defendants, who offer such services and such leases, engage in a range of fraudulent practices, including:  fraudulently altering signed contracts purportedly entered into by individuals and businesses seeking merchant card services and associated equipment leases; wrongfully taking unauthorized fees and other charges from bank accounts belonging to such individuals and businesses; charging exorbitant and unconscionable rates for leasing of credit card processing equipment; and failing to notify customers of their practices.

2.      Plaintiffs, for themselves and all others similarly situated ("Class Members"), bring this action pursuant to Arizona's consumer protection statute (Ariz. Rev. Stat. §44-1522), New York Deceptive Sales Practices Act (N.Y. Gen. Bus. § 349), and

44 other state consumer statutes. Plaintiffs also seek relief for common law fraud, deceit and misrepresentation, negligent misrepresentation, conversion, breach of contract, and unjust enrichment.

## JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, as codified at 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant, there are more than 100 class members nationwide; the aggregate amount in controversy exceeds $5,000,000; and minimal diversity exists.

4.       Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### Plaintiffs

5.       Plaintiffs Sharon and Rodney Simington (the "Simingtons") are individual consumers who own a small business known as Paintball Uphoria and who at all times alleged in this Complaint operated that business in Kingman, Arizona.  The Simingtons assert their claims in this Second Amended Complaint individually and on behalf of all others similarly situated against Defendants Lease Finance Group, LLC, Northern Leasing Sysyems, Inc., Jay Cohen, Leonard Mezei, Sara Krieger, and North American Bancard Systems, LLC.

6.       Plaintiff Akhtar Zamir ("Zamir") is an individual consumer who owns a small business known as Norwalk Smoke Shop and who at all relevant times alleged in this Complaint resided in New York, New York and operated Norwalk Smoke Shop in Norwalk, Connecticut.  Zamir asserts his claims in this Second Amended Complaint individually and on behalf of all others similarly situated against Defendants Lease Finance Group, LLC, Northern Leasing Sysyems, Inc., Global Leasing Company, Inc.,

Jay Cohen, Leonard Mezei, Sara Krieger, and Payment Systems Inc.

**Defendants**

7.      Defendant Lease Finance Group, LLC ("LFG") is a Delaware corporation with its principal place of business at 132 West 31st Street, New York, New York.  LFG is engaged in the equipment lease financing business.

8.      Defendant Northern Leasing Systems, Inc. ("NLS") is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York.  NLS is engaged in the equipment lease financing business and upon information and belief is the affiliate, alter ego and umbrella organization of LFG and many other shell entities that conduct leasing operations at the same address and use the same staff as NLS.

9.      Defendant Global Leasing Company ("Global") is a corporation with its principal place of business at 633 West Fifth Street, #6770, Los Angeles, California.

10.     Defendant Jay Cohen is the President and Chief Executive Officer of NLS, and an officer of LFG.  Cohen is one of its masterminds of the enterprise which is the subject of this action.

11.     Defendant Leonard Mezei is the Chairman of the Board of NLS and is also an officer of LFG.

12.     Defendant Sara Krieger is the Vice President for Operations of NLS.

13.     Defendants Cohen, Mezei, and Krieger, direct and control NLS, LFG and various shell entities as more fully described below.  (Together, NLS, LFG, Global, Cohen, Mezei, and Kreiger are referred to herein as the "Lease Finance Defendants.") Cohen, Mezei, and Krieger worked in concert to cause NLS, LFG, Global, and the shell entities to engage in the conduct described in this complaint. In particular, the individual Defendants each directed NLS, LFG, Global, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the NLS, LFG, shell entities, and certain other members of the scheme

as more fully described below, to consummate the unlawful transactions described herein with Class Members, to unlawfully deduct monies from Class Members' accounts, and to attempt to enforce unlawful contractual provisions against Class Members. Cohen, Mezei, and Krieger have all profited personally from those activities.

14.     Defendant North American Bancard Systems, LLC ("NAB") is a New York corporation with its principal place of business at 47 Allen Blvd., Farmingdale, New York, County of Nassau. NAB is a provider of merchant card services; such providers are also referred to in the industry as "Independent Service Organizations" or "ISOs."

15.     Defendant Payment Systems, Inc. ("Payment Systems") is a corporation with its principal place of business at 5901 Priestly Drive, Suite 303, Carlsbad, California 92008. Payment Systems is an ISO.

16.     NAB and Payment Systems are two of the ISOs with whom the Lease Finance Defendants have conspired to carry out their fraudulent scheme. (Together, NAB and Payment Systems are referred to herein as the "ISO Defendants.")

## FACTS PERTAINING TO ALL CLAIMS

### Overview

17.     Defendants are engaged in a nationwide scheme to defraud individual consumers and small business owners in connection with the sale of electronic payment processing services, including the processing of debit and credit card transactions, and the leasing of associated equipment.   Operating through over 100 shell entities (the "Shell Entities") from the same offices with the same staff and same modus operandi, the Lease Finance Defendants pay substantial commissions to their agents, including the ISO Defendants, to obtain, by any means, Class Members' signatures on a standard form application/contract ("Form Lease"). To obtain that signature, Defendants promise individual consumers and small business owners low transaction fees for their processing services.  After the applicant has signed the Form Lease, Defendants alter the contract by adding pages that were never shown to the applicants and by filling in

blank areas with new terms. These newly added pages and terms include purported provisions for early termination fees, liquidated damages, liability limitations, arbitration clauses, and choice-of-law and choice-of forum provisions. Sometimes, Defendants go so far as to forge the initials or signatures of the individual consumers and small business owners on the newly added pages or filled in areas.

18.     The altered contracts contain unconscionable provisions, including long-term leases that require the individual consumer or small business owner to pay wildly inflated monthly rental fees for credit card processing terminals and inflated early-termination fees, and require the individual consumer and small business owners to personally guarantee the contracts.  The contracts also authorize Defendants to debit payments purportedly due under the agreements directly from the customer's bank account.

19.     Once Class Members' signatures are obtained (or fraudulently inserted through electronic or written forgery), Defendants electronically debit Class Members' bank accounts for the higher-than-disclosed processing rates, inflated rental fees, and other unauthorized charges. Defendants' inflated or unauthorized withdrawals include: (a) over-charges for property taxes, where Defendants pocket the difference between what was charged and what Defendants paid; (b) an undisclosed $25 "filing fee" for property tax returns in connection with such property tax payments; and (c)  charges of $4.95 per month per piece of leased equipment towards an "LDW" ("loss damage waiver") program, which program purports to provide what is in fact illusory insurance coverage for the "leased equipment."

**Lease Financing and Independent Sales Organizations**

20.     Defendants are involved in various aspects of the market for electronic payment processing services, which involves several different players, often working together to defraud individuals and small business owners who have need of such services.  The Lease Finance Defendants supply financing for the leasing of electronic

point-of-sale equipment, such as ATM machines, cash registers, and credit card processing equipment. The Lease Finance Defendants conspire with providers of payment processing services, the ISOs, to defraud merchants who have need of such services. The ISO Defendants are among the ISOs who are part of the scheme.

21. In order to accomplish their fraudulent scheme, the Lease Finance Defendants have established relationships with ISOs all over the United States. The ISOs act as agents for the Lease Finance Defendants and provide the sales force necessary to effectuate the scheme orchestrated by the Lease Finance Defendants.

22. Sales agents working for the ISOs and in furtherance of the scheme, approach merchants who may want to use, or who already use, electronic payment processing services and convince them to sign up for the ISO's services. The sales agent also offers the merchant a lease with the Lease Finance Defendants for the equipment necessary to process payments. Thus, the sales agent sells both the ISO's processing services and the Lease Finance Defendants' leasing services in what appears to the merchant to be a single, undivided transaction. Lease of the equipment through the Lease Finance Defendants is presented by the sales agent as a requirement for obtaining the ISO's processing service.

23. The leases offered by the Lease Finance Defendant are exorbitantly inflated and unconscionable. The Lease Finance Defendants lease equipment with a fair market value between $200 and $400 dollars if purchased outright for lease payments between $100 and $200 dollars *per month over a period of 48 months*, so that merchants end up agreeing to pay between $4,800 and $9,600 for the equipment.

24. The Lease Finance Defendants are able to get merchants to agree to these exorbitant rates by having the sales agent promise huge savings on the monthly cost of the ISO's processing services, so that the net cost to the merchant is made to appear lower than the cost of processing services offered by competitors. Thus, by offering the processing services and the leases together through a single sales agent, the Defendants

are able to inflate the cost of the equipment lease and hide the inflated cost.  The ISOs profit too because the cost savings are illusory; in reality, through a variety of techniques described below, the ISO charges the merchant substantially more than the sales agent represents.  In addition, the Lease Finance Defendants share the exorbitant cost of the lease with the ISO, in effect paying the ISO to assist them in selling the unconscionable lease to the merchant.

25.     In a legitimate lease transaction, the lessor's ability to inflate the lease payments is usually limited by value of the equipment as security for the lease.  If the lessee defaults on the lease, the lessor will want to be able to repossess the equipment and offset its loss. Where the lease calls for payments totaling more than 20 times the value of the equipment, however, repossession provides no remedy if the lessee defaults.  The Lease Finance Defendants are able to circumvent this limit on their ability to offer exorbitantly inflated leases by requiring merchants *personally* to guarantee the lease payments.  Having secured this personal guarantee, the Lease Finance Defendants are free to set any payment amount they choose, with no relationship to the value of the equipment being leased, so long as the sales agent can convince the merchant that the ISO will make up the cost through discounts on processing services.

26.     Nor are the Lease Finance Defendants content with the rewards of their unconscionably priced leases, sold through fraudulent representations about the cost of processing services offered by their partners-in-fraud, the ISOs.  As part of the process of entering into the lease, merchants are required to provide information sufficient to allow the Lease Finance Defendants to debit lease payments automatically from the merchant's bank account.  The Lease Finance Defendants then use this information to withdraw additional amounts of money from merchants' accounts beyond the already-inflated cost of the lease.  The Lease Finance Defendants claim that these payments represent additional fees authorized by the leases the merchants have signed, but in many cases, these fees are contained on pages not shown to the merchant, but rather

fraudulently added to the lease after the merchant has already signed, or even on pages on which the merchant's signature has been forged. Even where fees may be authorized, the Lease Finance Defendants often withdraw more money from the merchant's bank account than the amount they may legitimately be authorized to charge for a particular fee or service.

27.     For their part, the ISOs, including the ISO Defendants, use these same techniques to charge more for their services than the discounted prices used to induce merchants to sign up in the first place. Just as the Lease Finance Defendants obtain banking information and authorization to debit a merchant's bank account directly, so too the ISOs obtain this information to cover the monthly processing fees. They, too, then debit the bank account for amounts in excess of the rates promised to the merchants. Again, these additional fees may be contained on pages of the processing agreement that were never shown to the merchant and only added to the agreement by the ISO after the merchant has already signed. The ISOs, including the ISO Defendants, may even forge the merchant's signature on such additional pages. They also withdraw amounts in excess of the amounts authorized and may even continue to debit the merchant's bank account after the agreement has been terminated.

28.     By the time the merchant realizes that the amounts being debited from the bank account are in excess of the amounts represented, it is too late. Defendants tell the merchant that the agreements cannot be cancelled. They continue to debit the merchant's bank account for unauthorized amounts and unconscionable lease payments.

**The Conspiracy**

29.     Defendants have conspired with one another and with other unscrupulous ISOs and agents to defraud consumers and small businesses and hide profits earned through their fraudulent criminal activities.

30.     At all times herein mentioned, each of the Defendants was the agent,

servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

31.     At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common conspiracy, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common conspiracy.

32.     At all times herein mentioned, the acts and omissions of Defendants, and each of them, contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

33.     At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein. At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

34.     NLS, LFG and the Shell Entities operate under the direction of Jay Cohen and Leonard Mezei, who manage the operations of NLS and LFG and their participation in the conspiracy. Defendants Cohen and Mezei oversee the operations of NLS, LFG and the Shell Entities, making key decisions to further the fraud and increase the profits of NLS, LFG and the Shell Entities. Cohen and Mezei orchestrate and execute the overall scheme to defraud Class Members, including but not limited to holding the Shell Entities out as separate businesses, even though their true intent was to use the shell companies to confuse and mislead victims and the courts.

35.     Defendants Cohen and Mezei know that the leases enforced by the NLS, LFG and the Shell Entities had been obtained through fraud, forgery, and deceit, and have structured the Shell Entities to further that fraud and ensure that victims who are

harmed cannot be adequately compensated.

36.     Defendant Sara Krieger participates in the conspiracy and ensures its success by soliciting new ISOs and executing the fraudulent lease agreements. Defendant Krieger knows or reasonably should know that these leases have been forged or obtained through fraud and deceit, but approves them to increase her own personal profit and the profits of the NLS, LFG and the Shell Entities.

**The Deceptive Form Lease**

37.     The first page of the Form Lease appears to be a complete document.  It contains all the material information normally associated with such transactions (name, address, amount, equipment information, term, bank information) and signature blocks for both parties; however, that first page contains nothing incorporating the remaining three pages, or even alerting Class Members to the existence of additional pages that may be part of the Form Lease.  The first page of the Form Lease contains the following statement which appears in a box under the caption "Lease Acceptance", which box also contains the space for Class Members' signature:

> Lessee has read and agrees to all terms and conditions contained in this Equipment Finance Lease.

38.     That "Lease Acceptance" box is followed by two other boxes on the same page.  One box provides for Class Members' personal guaranty, and the other is for signature of acceptance by Defendants.  Thus, the first page effectively conveys that the Form Lease is a one page document.  Class Members are routinely led to believe that the Form Lease is comprised of just that one page, which belief was actively fostered by Defendants' agents at the time of lease-signing.

39.     In fine print at the bottom of that page, tucked away in its far left corner is an inscription which reads "page 1 of 4".  The placement and size of the print, which is difficult to read even if noticed, is obviously a part of Defendants' scheme and does nothing to enable Class Members to detect or inquire about additional terms.  Thus,

when Class Members complain about not ever having been aware of the existence of the additional three pages, Defendants routinely relied on this buried fine print, disclaim their agents' misrepresentations, and blame Class Members for allegedly not having read the buried fine print and/or not having conducted an in-depth investigation on their own.

### Failure to Provide Copies of the Form Lease to Class Members At Time of Lease Signing

40.     Consistent with this unlawful scheme, Defendants' agents never discuss, mention, or even refer to the remaining three pages of the Form Lease, nor are copies of the Form Lease left with Class Members at the time of signing; instead, Class Members are simply told that a copy will be mailed to them.  By that time, of course, Defendants assert that the Form Lease has allegedly become "irrevocable" and non-cancelable for the entire term, usually 48 months.

41.     Moreover, even when Defendants belatedly send copies of the Form Lease, i.e., after it has allegedly been accepted and become irrevocable, such copies are made at reduced size (2 pages reduced to 1).  Thereby, the already unreadable, legalistic terms are rendered even more difficult to read or understand by Class Members.  As a result, it is often months before Class Members even know of all the terms of the Form Lease.  In sum, the first page of the Form Lease is the only one routinely seen by Class Members at the time of execution.  Accordingly, the terms contained in the remaining 3 pages cannot be said to have been agreed to by the Class Members.  They are not incorporated into the Form Lease, they appear after the signatures of Class Members, and are therefore unenforceable.

### Concealment of Material Facts

42.     As set forth above, Defendants' agents deceptively induce Class Members, with affirmative misrepresentations and concealment of material facts, to sign the Form Lease.  Defendants then disown these fraudulent inducements, and claim that the Form

Lease represents an irrevocable commitment for overpriced items at onerous terms. Unknown to Class Members at the time of signing, the leased equipment items are typically available in the market for outright purchase, free and clear, at a small fraction of the price Defendants charge over the term of the lease.

43.     Defendants routinely disclaim all their agents' representations made at Form Lease inception, and point to the merger clause of the Form lease as justification for attempts to enforce the onerous and unconscionable terms of the remaining, unseen pages of the Form Lease.  In fact, an integral part of Defendants' fraudulent scheme, is the active concealment from Class Members of the harsh terms of the three undisclosed pages of the Form Lease, which includes provisions that purport to:

     a.  entitle Defendants to charge sums significantly higher than those specified in the first page of the Form Lease;

     b.  allow for automatic electronic deductions from Class Members' bank accounts;

     c.  continue indefinitely Class Members' other Form Lease obligations unless Class Members gave a specific advance 30 day notice of cancellation, with a buyout balloon payment, at the end of the specified term;

     d.  immunize Defendants from any warranties for the equipment;

     e.  shield Defendants from answering for any failure or malfunction of the equipment even though Defendants retain title to the leased equipment;

     f.  make absolute and non-cancelable the Class Member's obligation to pay Defendants;

     g.  impose upon Class Members an insurance obligations to Defendants with respect to the equipment leased;

     h.  allow Defendants, in the event of an alleged default, "without demand or legal process [to] enter into the premises where the equipment may be found" and repossess or disable the equipment;

    i.   impose charges for late payment of monthly dues an extortionate 15%, with a minimum of five dollars;

    j.   impose upon Class Members,  in the event of litigation, a one-way obligation to pay Defendants:

        i.   Attorneys' fees up to $1,500;

        ii.   "Reasonable attorneys' fees" for recovering possession of the equipment;

        iii.   Costs of the suit;

        iv.   $250 towards "internal collection overhead;"

        v.   $225 towards "internal repossession and remarketing overhead"; and

        vi.   All "other" expenses.

    k.   add a provision that any litigation would be venued in New York or such other place where the "holder of lessor's interest" - i.e., Defendants or any of their 100 shell-entities  - "maintains its principal office for administrating this lease."  In other words, the forum would be (and most commonly was) far away from Class Members' homes and businesses. Furthermore, the chosen forum could be changed by Defendants at any time by simply transferring the Form Lease to one of their affiliates registered - or to be registered - elsewhere; and

    l.   allow that Defendants -- but not Class Members - may effect service of process for a legal proceeding by certified mail, return receipt requested.

**Defendants' Abuses Regarding Class Members Who Object or Default**

    44.   In the event of default by lessees, Defendants routinely proceed against the Class Member guarantors personally.  Indeed, Defendants promptly proceed to disparage the guarantor's personal credit, and damaging the guarantor's consumer credit score, by repeatedly pulling his/her personal credit report, and by making

inaccurate and adverse credit entries in disregard of federal and state credit reporting statutes.   Defendants manufacture these adverse entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor. Such adverse entries end up costing Class Members dearly, sometimes up to tens of thousands of dollars.

45.    Defendants' approach to collection is aggressive.   They use the undisclosed provisions of the Form Lease described above to obtain payment, dunning Class Members with collection letters, threatening to disparage their personal credit reports, and obtaining default judgments against those who still refuse to pay.

46.    In these dunning phone calls, Defendants' representatives expressly and routinely tell Class Members that it would be more expensive for such Class Members to litigate Defendants' claims in New York than it would be to pay off Defendants.  And when Class Members do not succumb to this threat, Defendants hound them with repetitive and abusive phone calls, in an attempt to brow beat Class Members and interfere with their personal or business operations.  Defendants' representatives annoy and intimidate Class Members in this manner at home, at work, and at any other telephone number for such Class Members that Defendants can find.

47.    When Defendants commence legal proceedings, Class Members rarely have the opportunity to raise any defenses.  Defendants regularly file their collection suits in New York, despite the fact that most of the Class Members reside in far away states.   Few if any can afford the expense of litigation in a distant forum, and even Class Members who do obtain counsel are hampered by the undisclosed Form Lease provision.   Given the amounts in controversy, it is financially burdensome and impractical for Class Members to gather evidence and put on potential witnesses in their defense, because they are most often located in Class Members' home states, far from the New York City Civil Court.

**Defendants' Fraudulent Charges**

48.    Defendants routinely charge amounts in excess of those in the Form Leases and/or amounts which are not even disclosed in the Form Lease.

*Loss Damage Waiver*

49.    First, Defendants routinely charge a fee of $4.95 per month per piece of equipment leased for a "loss & damage waiver" ("LDW").  This fee is assessed upon all lessees who purportedly do not provide proof of insurance.  Defendants' Form Lease typically provides on the undisclosed third page of the Form Lease (of which most Class Members are unaware) that an unspecified amount would be assessed towards LDW.  The Form Lease does not disclose how often the LDW would be charged, and further authorizes Defendants to change that unspecified amount at any time for any reason.

50.    The Form Lease conditions this levy of LDW charge upon a Class Member's failure to provide proof of insurance to Defendants prior to lease commencement, which is, in turn, conditioned upon Defendants' request for such proof; but Defendants routinely do not request proof of insurance coverage from Class Members, thereby ensuring that Class Members remain unaware of the LDW charge or the need to provide proof of insurance to avoid the charge at lease inception.

51.    Also undisclosed to Class Members is that Defendants' LDW "program" has a deductible of $200.  As Defendants are well aware, the replacement cost of the equipment covered is far below this deductible.  In sum, the alleged "LDW Program" is a ruse for Defendants to collect money, since the $200 deductible will always be more than the replacement cost of the leased equipment.

*Property Taxes*

52.    Second, Defendants overcharge lessees for property taxes, routinely collecting from Class Members amounts greater than the taxes actually paid by Defendants to taxing authorities.

15

53.     Upon information and belief, Defendants initially used "acquisition cost" as the property tax basis for leased equipment, defined as the cost of acquiring the lease. Defendants soon shifted to a value for the property tax basis that was almost universally much lower that the acquisition cost, while nevertheless continuing to collect from Class Members at the much higher tax level, while retaining the difference in furtherance of the scheme.

*Filing Fees*

54.     Third, in addition to the property taxes, Defendants charged Class Members a filing fee of $25 per property tax payment.  The existence, amount, and frequency of this filing fee is concealed from Class Members by Defendants, who levy it capriciously, even though Defendants were well aware that the filing fee was not authorized by the Form Leases.

**The Simingtons' Transactions**

55.     Rodney Simington ("Rodney") was informed in 2008 that he had "won" a cash register on eBay through NAB.  When the item was due to be paid for and mailed, an NAB sales representative named Chris sent a message to contact him directly for a great business opportunity.  After calling Chris, Rodney was informed that the cash register came with a free trial of a debit/credit card machine, but that he could not have the cash register unless he agreed to try the machine as part of the great deal. According to Chris, this offer was a free trial with no obligation. All Rodney had to do was to fill out the application and fax it back to Chris.  Chris said that with the first 100 cash register applications, NAB would offer a promotion for a free cash incentive to new businesses in the amount $750.00, so Rodney "had better act fast."  This promotion, and many other subsequent promises, proved to be entirely false misrepresentations, the purpose of which was to induce Rodney to enter into the fraudulent lease arrangement.

56.     The debit/credit card machine being offered would allow Rodney to

accept debit and credit cards at his business.   When the charges were processed, NAB would pay Rodney the amounts charged, less a per-transaction processing fee, by depositing the money owed directly into Rodney's business bank account.   Lease payments for the equipment would be withdrawn directly from the bank account as well.

57.   Rodney filled out the application and faxed it to Chris.  The application also requested that Rodney include a "voided" copy of a check so that NAB would know where payments for debit and credit charges could be deposited.  Chris stated that the per-transaction fee that would be deducted from each payment would be a minimum of 75 cents per use or a 1.5% fee on the total value of each sale, whichever was greater.  This also proved to be false.

58.   Rodney received the debit/credit card machine, and began accepting payment by credit or debit card at his business.  At some point, Rodney realized that the funds for these charges were not being deposited into his account. Rodney attempted to contact Chris and was informed by another employee identified as Natalie (who would not give her last name because "they are not allowed to") that Chris was never employed there.

59.   Rodney finally spoke to a Joshua located in Missouri about the missing payments.  When Rodney asked Joshua why deposits were not showing in his account, Joshua assured him that he would take care of the matter.

60.   At the same time that Rodney spoke to Natalie about the missing deposits, he also inquired about the $750 incentive payment, which similarly had not been paid into his business bank account.  Natalie told him that the $750 deposit incentive for trying the product was not applicable to Rodney because he had to enter a longer term lease - at least 1 year - to receive the incentive payment.  This, of course, was the first time Rodney had ever heard of such a restriction.  Rodney was then told to contact the NAB branch in South Dakota and then to contact another branch located in Chicago,

Illinois.

61.     After Rodney spoke to NAB, a few debit or credit card transaction receipts began to show in Rodney's account, although many never did.  NAB deducted from the amounts charged a per-transaction fee, but at a much higher rate than the agreed-upon 1.5% or 75 cent fee; indeed, for all the transactions for which Rodney was actually reimbursed, the fees charged exceeded 20%.

62.     In addition, Defendants began to withdraw money from Rodney's account at random amounts; these withdrawals, in amounts ranging from $108.00 to over $200.00, were all labeled "Global Pay" fees.   Some of the lease payments for the credit/debit card terminal also began to appear as a separate deduction in the amount of $35.00.  Rodney then tried to contact Joshua and was informed there was no Joshua employed at NAB.  He tried to contact Natalie and that number was then out of service.

63.     Rodney tried to call NAB through the numbers available through his own bank's records which referenced the deductions from his account, and was transferred to another line with an answering message for a Merissa, with whom Rodney left numerous messages which were never returned.  Rodney then called the NAB main number and told a customer service person named Irene that he would be returning this debit/credit card machine immediately. Irene stated that if he cancelled the agreement, he would incur a $750.00 fee and that he was "on a contract."

64.     Thereafter, anticipating more fraudulent deductions, Rodney went to his bank to put a stop payment on NAB withdrawals from his account; as a result, the bank initiated an investigation.  Rodney was later informed by his 10 year- old son and 15 year-old daughter about several harassing phone calls from a someone who refused to give a name, asking questions like "where does your Dad work?; how much money does he make?; when does he come home?; what is your address?"  One of the callers told the son to "tell your Daddy, we are going to sue him and this is a promise from Bancard."  Rodney himself answered the next such call and spoke directly to a person

claiming to be a supervisor named Estevan, who claimed that Rodney owed money for cancelling this contract and that "he would get it out of [me] any way he could." Rodney told  Estevan that he wanted to see "the contract," which Estevan said he would send.

65.    Several weeks later, Rodney received what purported to be a contract between himself and LFG, an entity he had never heard of.   Nor had he ever seen the contract they were claiming he had signed.  The signature on the contract purporting to be his appears to have been "cut and pasted" from his original application directly to this document.

66.    Several months after the events described above, NAB made unauthorized withdrawals Sharon Simington's ("Sharon") personal bank account.  Sharon received an e-mail soon after a paycheck of hers was deposited into this account with an overdraft warning.  Sharon investigated with the bank and found that there had been two recent withdrawals from the account of which she was unaware, one in the amount of $400.00 and another in the amount of $405.00. Sharon immediately called NAB and was informed there was no information in her name, social security number, bank routing number, identification number, or tracing number and she was asked to fax her bank statement.  She refused, and went back to her own bank to dispute the matter, which put the matter under investigation.

67.    On or about October 17, 2009 Rodney received a dunning letter from LFG stating that he owed $5,443.50.

**Zamir's Transaction**

68.    In June, 2009, Akhtar Zamir was approached at his place of business by Samantha Malm ("Malm"), an agent of Defendant Payment Systems, who promised him that she could substantially reduce his costs for credit card processing if he agreed to enter a an agreement with Payment Systems and an associated lease for his processing equipment.   At the time, Zamir was using a different merchant service provider for

electronic payment transactions; the equipment needed to process the transactions with his existing provider was free.

69.     Malm promised Zamir a pricing plan for processing services entitled "Discount with Enhanced Billback" which she set out in detail on a worksheet. The worksheet showed discounted rates for transaction and authorization fees for credit, debit, and gift cards.   The discounts for processing services were so steep that the worksheet showed that Zamir would save $189.00 per month as compared to the fees he was then paying for credit card processing service even after deduction of payments for an equipment lease. Zamir was also told that he would be provided equipment that would also allow for Gift Card activation.

70.     On August 6, 2009, Zamir executed a Merchant Application and Agreement (the "Application") with Payment Systems.

71.     On August 20, 2009, Zamir executed a "Non-Cancellable Lease" with Global for credit card processing equipment. The term of the lease was 48 months and the lease payments were $169.00 per month.

72.     On August 25, 2009, Zamir received a letter from LFG, an entity with whom he had no contract, no prior relationship, and about which he knew nothing, purporting to confirm that it had provided lease financing for certain equipment.  The letter also notified Zamir that he was now being charged a $4.95 per month Loss Damage Waiver fee for failing to provide evidence that he had obtained a certificate of insurance covering the equipment.

73.     A short time later, Zamir received his first bank statement including fees charged for transactions with his new equipment. To his surprise, he discovered he was paying almost $200 more in total fees than he had with his previous provider, notwithstanding the promises which had been made to him by Malm.  He also learned that he was not provided Gift Card activation services.

74.     When Zamir tried to contact Payment Systems to complain, he was met

with complete indifference and a blanket refusal to honor the transaction rates which had formed the basis of his bargain with Payment Systems and Global.

75.     After three frustrating months of trying to have Payment Systems and Global honor their agreements with him, Zamir closed the bank account from which sums were being deducted by Payment Systems and Global and moved to a different provider.

76.     On February 4, 2010, LFG sent Zamir an invoice billing him for "Lease Payment, Insurance Non-Compliance Fee, Property Tax Mgmt Fee and Sales Tax" in the amount of $191.58.  The invoice also showed a past balance of $239.47 and demanded total payment in the amount of $431.05.

77.     Thereafter, Zamir received a Demand for Payment dated July 30, 2010, on LFG letterhead. The demand claimed that Zamir owed an outstanding balance of $10,540.25. Zamir also received a letter from Joseph I. Sussman, P.C. dated August 9, 2010, purporting to represent LFG. The letter stated that LFG was accelerating the remaining lease payments, that Norwalk Smoke Shop now owed $7,267.00, and that Zamir was responsible as guarantor.  Finally, a Final Notice on LFG letterhead dated August 10, 2010 showed an outstanding balance of $10,540.25 and threatened to "plac[e] a lien on real or personal property, Local Docketing, Wage Garnishments and Bank Restraints."

78.     On or about December 3, 2010, LFG commenced an action in the Civil Court of the City of New York captioned *Lease Finance Group, LLC v. Akhtar Zamir*, by the filing of a Verified Complaint.  The Verified Complaint alleged that Zamir had entered into a contract with LFG and asserted that the contract was annexed as Exhibit A.  The Verified Complaint further alleged that pursuant to the agreement annexed to the complaint, Zamir owed LFG $7,267.00 plus $1,453.40; the accompanying Summons thus stated that Zamir owed LFG a total of $8,720.40.  The Summons, the Verified Complaint, and the Verification were all signed on August 9, 2010.

79.     The Verification accompanying the Verified Complaint was signed by Robert Taylor, who stated that he was the "Legal Collections Manager of the plaintiff herein."  He verified under oath that allegations in the Verified Complaint were "true to his own knowledge, based on his personal knowledge and review of documents and records created and and/or maintained by plaintiff in the ordinary course of its business."  Taylor made this statement even though the Verified Complaint alleged that Zamir had entered into an agreement with LFG and the contract attached to the Verified Complaint as Exhibit A showed that the agreement was in fact with Global.

**Other Similar Complaints Nationwide**

80.     The Better Business Bureau of Chicago/Northern Illinois reports 741 complaints against LFG on its website with the following entry:

> "Consumer complaints allege misrepresented and objectionable sales practices, and/or unauthorized charges and debits from consumers' bank accounts, and/or lack of notification of end of contract and subsequent renewal and billing. Further complaints allege technical problems with the credit card processing equipment provided by Lease Finance, and difficulties in either obtaining help from the company or returning the equipment in a timely fashion. The company deems that returning its own equipment does not relieve consumers from their payment obligations per the lease agreement, despite the fact that the consumers may no longer have any equipment and/or receive any services. Additional complaints allege that the three day right of rescission and timely termination of contract have not been honored. Other allegations cite poor customer service, being hung up on by company representatives, the company pursuing allegedly unwarranted collection actions and contacting credit report agencies despite consumers' continuous attempts to provide documentation to support their cases. Upon sending requested documentation to Lease Finance, multiple consumers allege that the company declines receiving it and/or claims it was sent to the wrong location. Additional consumers allege to have never signed contracts with the company and question where the alleged signatures baring their names came from."

81.     A review of internet consumer sites reveals numerous similar complaints.

## CLASS ALLEGATIONS

82.     Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated. The Class is defined as follows:

> All persons (including natural persons, corporations, partnerships, or other legal entities) who, from August 11, 2004 to the present, applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants.

Such persons shall be referred to as "Class Members" or "class members."

83.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

84.     **Numerosity:** Plaintiffs do not know the exact size of the class, but it is estimated that it is composed of more than 100 persons. The persons in the class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

85.     **Common Questions Predominate**: This action involves common questions of law and fact to the potential class because each class member's claim derives from the same set of deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the class to recover. Among the questions of law and fact common to the class are:

   a.   Whether Defendants to engage in activity designed to defraud the Class;

   b.   Whether the contracts entered into by class members are enforceable and/or unconscionable;

   c.   Whether Defendants unfairly, unlawfully and/or deceptively failed to provide class members all pages of operative agreements;

   d.   Whether Defendants unfairly, unlawfully and/or deceptively failed to

inform class members of the exorbitant rates for leasing equipment;

e.  Whether Defendants' advertising and marketing materials regarding their merchant card services and/or equipment that they sold or leased were likely to deceive Class Members or was unfair;

f.  Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

g.  The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

h.  Whether Class Members are entitled to declaratory, injunctive and other equitable relief and, if so, what is the nature of such relief;

i.  Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief; and

j.  Whether Class members are entitled to disgorgement and/or restitution.

86.  **Typicality:** Plaintiffs claims are typical of the class because Plaintiffs completed applications and/or entered into contracts with Defendants and their agents that are identical or nearly identical to the standard form contract used by Defendants and their agents. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged;

87.  **Adequacy:** Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced

24

class action attorneys to represent their interests and that of the class. No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such, that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability to all Class Members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

88. **Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Consumer Fraud

89. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

90.    Defendants have engaged in deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522 wrongfully taking fees and other charges from Plaintiffs' and class members' bank accounts and charging Plaintiffs and class members exorbitant and unconscionable rates for leasing of credit card processing equipment.  Plaintiffs also seek remedies for Defendants' failure to adequately notify customers of this practice.

91.    Defendants engaged in material, deceptive, consumer-oriented acts, in the conduct of their business that injured New York citizens in violation of N.Y. Gen. Bus. § 349  by  wrongfully taking fees and other charges from Plaintiffs' and Class Members' bank accounts and charging Plaintiffs and class members exorbitant and unconscionable rates for leasing of credit card processing equipment.  Plaintiffs also seek remedies for Defendants' failure to adequately notify customers of this practice.

92.    Defendants engaged in consumer oriented activity that did harm to the public interest and the public at large that was directed to consumers like Plaintiffs and which affected similarly situated consumers.  Class Members were treated like customers of the individual ISOs and banks, and their personal accounts were debited accordingly.

93.    Defendants furthermore engaged in this unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed as follows.

      a.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471 et seq.

      b.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.

      c.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et seq.

      d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev.

Stat. § 6-1-105, et seq.

e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, et seq.

g.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.

h.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.

i.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. §10-1-392, et seq.

j.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, et seq.

k.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.

l.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 50511, et seq.

m.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, et seq.

n.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1 b, et seq.

o.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.

p.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, et seq.

q.   Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of La. Rev. Stat. § 51:1401, et seq.

r.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation Mass Gen L. Ch. 93 A, et seq.

s.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.

t.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq.

u.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, et seq.

v.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010, et seq.

w.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, et seq.

x.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq.

y.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq.

z.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:l, et seq.

aa.  Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Rev. Stat. § 56:8-1, et seq.

bb.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, et seq.

cc.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.

dd.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, et seq.

ee. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, et seq.

ff. Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. 15 § 751, et seq.

gg. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, et seq.

hh. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, et seq.

ii. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq.

jj. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, et seq.

kk. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. code Laws § 37-24-1, et seq.

ll. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq.

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, et seq.

nn. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code. § 13-11-1, et seq.

oo. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451, et seq.

pp. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code 59.1-196, et seq.

qq. Defendants have engaged in unfair competition or unfair, deceptive or

fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, et seq.

rr. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, et seq.

94. The unfair and deceptive acts and practices of Defendants have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and the members of the Class.

95. The actions and failures to act of Defendant, and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendant of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale and or/leasing of merchandise of Defendant in violation of the consumer protection statutes listed above

96. Plaintiffs and class members relied upon Defendants' misrepresentations and omission in applying for and entering into equipment lease contracts and by reason of the unlawful acts engaged in by Defendant, Plaintiffs and the Class have suffered ascertainable loss and damages.

97. Plaintiffs and all others similarly situated were injured by Defendants' deceptive acts because they unknowingly were charged and improperly assessed fees to their bank accounts that they would otherwise not have incurred.

98. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs and the Class were damaged, and are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit, in an amount to be proved at trial.

### SECOND CLAIM FOR RELIEF
#### Common Law Fraud

99. Plaintiffs incorporate by reference all preceding paragraphs as if fully set

forth herein.

100.    Defendants made misrepresentations and omissions of facts material to Plaintiffs' and Class members' decisions to apply for and lease credit card processing equipment as set forth in detail above by actively concealing, and causing others to conceal, true information about the nature and implications of the application and contracts for the equipment and by not revealing to Plaintiffs and class members the entirety of the contracts.

101.    Defendants knew at the time that it made these misrepresentations and omissions that they were false or that Defendant had failed to disclose facts it was obligated to disclose in order to make its other representations not misleading. Defendants were aware that Plaintiffs and class members would rely on these misrepresentations and omissions, and that such representations were material in the Plaintiffs' and class members' decisions to apply for and enter into equipment lease contracts with Defendants.

102.    Plaintiffs and the Class reasonably relied upon Defendants' misrepresentations and omissions of material fact. Plaintiffs and the Class had no reason to doubt the veracity or validity of the information Defendants promoted through its marketing and sales strategies.

103.    Defendants' misrepresentations and omissions of material fact directly and proximately caused Plaintiffs' and the Class's damages.

104.    By virtue of the fraud they perpetrated on Plaintiffs and the Class, Defendants are liable to Plaintiffs and the Class for all damages Plaintiffs and the Class have sustained, plus punitive damages, plus the cost of this suit, including attorney's fees.

### THIRD CLAIM FOR RELIEF
Unjust Enrichment

105.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set

forth herein.

106.    As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments Plaintiffs and the Class made for equipment leases.

107.    In exchange for the payments they made for the leases, and at the time it made these payments, Plaintiffs and the Class expected that the equipment lease contracts were disclosed in full, that they would pay reasonable rates, and that Defendants had provided all of the necessary and accurate information and disclosed all of the lease contract's terms.

108.    Defendants have voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid exorbitant and unconscionable rates and fees for equipment leases when they otherwise would not have done so. The failure of Defendant to provide Plaintiffs and the Class with the remuneration they expected enriched Defendant unjustly.

109.    Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

FOURTH CLAIM FOR RELIEF

Deceit, Fraud and/or Misrepresentation

110.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

111.    The misrepresentations, nondisclosure and/or concealment of material facts made by Defendants to Plaintiffs and the members of the Class, as set forth above, were known by Defendants to be false and material and were intended by the Defendants to mislead Plaintiffs and the members of the Class.

112.    Plaintiffs and the Class were actually misled and deceived and were

induced by Defendants to incur charges and fees they otherwise would not have incurred.

113.    As a result of the conduct of Defendants, Plaintiffs and the class members have been damaged by having incurred unwarranted fees and charges taken from their bank accounts.

114.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class class members for deceit, fraud, and/or misrepresentation in an amount to be proved at trial.

<strong>FIFTH CLAIM FOR RELIEF</strong>

Negligent Misrepresentation

115.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

116.    Defendants had a duty to provide honest and accurate information to Plaintiffs and class members to prevent them from incurring exorbitant, fraudulent and unconscionable fees and charges associated with equipment leases.

117.    Defendants specifically and expressly indicated to Class members that the application for a "free trial" for credit card processing equipment and the amount they would be charged for 'terminal fees" was true and reliable, and that the lease contracts that Plaintiffs and class members agreed to were complete and included all terms, when in fact these representations were inaccurate and unreliable.

118.    Such misrepresentations were and are made by Defendants through the use of terms like "free trial" and 'terminal fees", when in fact such representations were not what they purport to be, and the various marketing materials and the contracts foisted on Plaintiffs and class members by Defendants were also misleading and false.

119.    Defendants knew or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand Defendants' representations concerning the term "free trial" as being what it

purported it to be -- "free" -- and that the "terminal fees" charged would be precisely what was represented they would be. Defendants also knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand and believe these various representations as accurate and reliable and that any other understanding on the part of consumers would not be reasonable given Defendants' representations.

120.    Plaintiffs and class members justifiably relied on Defendants' misrepresentations and made applications for and entered into lease contracts for credit card processing equipment, and were subsequently charged exorbitant rates and fees.

121.    As a result of the conduct of Defendants, Plaintiffs and class members have been damaged by having relied on Defendants' misrepresentations with regard to the equipment lease contracts.

122.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for negligent misrepresentation in an amount to be proved at trial.

SIXTH CLAIM FOR RELIEF

Conversion

123.    Plaintiffs incorporate by reference and re-alleges all paragraphs previously alleged herein.

124.    Plaintiffs and the Class members own and have the right to possess the money that is in their bank accounts.

125.    Defendants interfered with Plaintiffs' and the Class members' possession of this money by wrongfully taking directly from their bank accounts fees and charges associated with leases of credit card processing equipment from Defendants despite the fact that Plaintiffs and class members had never authorized such deductions at the rates and fees charged. Plaintiffs and the Class members never consented to Defendants taking such fees and charges from their bank accounts.

126.    Plaintiffs and the Class members have been damaged by Defendants'

wrongful taking of such fees and charges from their bank accounts in an amount that is capable of identification through Defendants' records.

127.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for conversion in an amount to be proved at trial.

SEVENTH CLAIM FOR RELIEF

Breach of Contract

128.    Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

129.    Defendants engaged in a pattern and practice of charging and collecting sums in excess of those specified in the equipment lease and applications provided to Plaintiffs and class members and by imposing different terms on the lease and contract than those promised and revealed to Plaintiffs and class members.

130.    In so doing, to the extent that Plaintiffs and the members of the Class entered into enforceable contracts with Defendants, Defendants breached those contracts. Defendants willfully and systematically concealed the terms of the contracts from Plaintiffs, the Class, and the general public, in a practice that is ongoing.

131.    Defendants further breached the covenant of good faith and fair dealing implied in every contract.

132.    Plaintiffs and the Class members have been damaged by Defendants' breach of contract as described herein.

133.    By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for breach of contract in an amount to be proved at trial.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief as follows:

A.   certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

B.  awarding Plaintiffs and the Class compensatory damages and restitution and/or disgorgement and other equitable relief as the Court deems proper;

C.  enjoining Defendants from engaging in the wrongful practices described herein;

D.  awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert-witness fees and other costs as may be deemed applicable; and

E.  awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, and all others similarly situated, hereby demand a trial by jury of all claims so triable herein.

Dated:  September 15, 2011

Respectfully submitted,

HANLY CONROY BIERSTEIN SHERIDAN
FISHER & HAYES LLP

By: _____

Mitchell M. Breit
mbreit@hanlyconroy.com
Andrea Bierstein
abierstein@hanlyconroy.com
112 Madison Avenue
New York, NY 10016-7416
Telephone:  (212) 784.6400
Facsimile:  (212) 213-5949

Hunter J. Shkolnik
hunter@napolibern.com
NAPOLI BERN RIPKA & SHKOLNIK
350 Fifth Avenue
New York, NY 10118
Telephone:  (212) 267-3700

Attorneys for Plaintiffs and the Proposed Class

*Of Counsel*
Richard J. Arsenault
[rarsenault@nbalawfirm.com](mailto:rarsenault@nbalawfirm.com)
NEBLETT BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71309
Telephone: (800) 256-1050

Derek Y. Brandt
[dbrandt@simmonsfirm.com](mailto:dbrandt@simmonsfirm.com)
SIMMONS, BROWDER, GIANARIS, ANGELIDES, & BARNERD, LLC
One Court Street
Alton, IL 62002
Tel. (618) 259-2222
Fax (618) 259-2251