UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                       :
RODNEY SIMINGTON and SHARON            :
SIMINGTON, d/b/a PAINTBALL UPHORIA,    :
and AKHTAR ZAMIR, d/b/a NORWALK SMOKE  :
SHOP, on behalf of themselves and all  :
others similarly situated,             :
                                       :
                          Plaintiffs,  :
                                       :
          -v-                          :
                                       :
LEASE FINANCE GROUP, LLC, et al.,      :
                                       :
                          Defendants.  :
------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 2 8 201

10 Civ. 6052 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

In their Second Amended Complaint ("SAC") (i.e., the third complaint plaintiffs have filed in this action), plaintiffs purport to bring a nationwide class action against defendants Lease Finance Group, LLC ("LFG"), Northern Leasing Systems, Inc. ("NLS"), Jay Cohen, Leonard Mezei, Sara Krieger (collectively, the "LFG Defendants"), Global Leasing Company, Inc. ("GLC"), Payment Systems Inc. ("Payment Systems" and collectively with GLC, the "GLC Defendants"),[1] and Northern American Bancard

---

[1] Plaintiffs include GLC in what they define as the "Lease Finance Defendants" (i.e., the LFG Defendants as defined by the Court plus GLC). However, GLC and Payment Systems have filed a joint motion to dismiss and the LFG Defendants (i.e., the Lease Finance defendants minus GLC) have filed their own joint motion to dismiss. Accordingly, the Court has defined defendants as above.

1

Systems, LLC ("NAB").[2]  The SAC alleges that defendants perpetrated a wide-reaching scheme to defraud small business owners by selling services and leasing equipment in connection with processing electronic payments (i.e., credit and debit card payment).  Specifically, and as discussed more fully below, plaintiffs allege that defendants promise low fees for the services and equipment, provide one-page of a four-page contract to small business owners for signature, and then charge exorbitant fees which defendants and/or their agents allegedly never disclosed.

Plaintiffs bring claims for consumer fraud under 46 state consumer fraud statutes, most relevantly New York's, Arizona's, and Connecticut's (Count One), common law fraud (Count Two), Unjust Enrichment (Count Three), "Deceit, Fraud and/or Misrepresentation" (Count Four), Negligent Misrepresentation (Count Five), Conversion (Count Six), and Breach of Contract (Count Seven).

The LFG Defendants and the GLC Defendants separately moved to dismiss the SAC in its entirety.  For the reasons discussed below, their respective motions are GRANTED IN PART and DENIED IN PART.

FACTUAL BACKGROUND

---

[2] NAB answered the SAC on November 18, 2011, asserting a counterclaim for contractual indemnity against plaintiffs.  (Dkt. No. 64.)  Accordingly, the Court's decision on the two motions to dismiss before the Court do not involve NAB.

For purposes of deciding the instant motions, the Court accepts as true all well-pleaded allegations in the SAC and draws all reasonable inferences in plaintiffs' favor.  See Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001).

On a motion to dismiss, a court may consider documents referenced in the complaint and/or incorporated by reference therein.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).  Here, both sets of moving defendants submitted copies of the purported contracts at issue in support of their respective motions.  (See Decl. of Sara Kreiger (Dkt. No. 63-3) Exs. A & B; Decl. of Michal A. Thurman in Support of Mot. to Dismiss Second Am. Class Action Compl. (Dkt. No. 58) Exs. B & D.)  Without submitting any affidavit or other sworn statement in opposing the validity of the leases, plaintiffs argue that the Court should not consider those contracts here because their authenticity is in dispute.  (Pls.' Br. in Opp'n to Defs.' Mots. To Dismiss ("Pls. Opp'n") (Dkt. No. 71) at 14-15.)  Given that the gravamen of the SAC is that the contracts are fraudulent and/or were entered into under false pretenses, the Court declines to consider those contracts on this motion to dismiss. See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) ("[B]efore materials outside the record may become the basis for dismissal, several conditions must be met.  For example, even if

a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."); Barberan v. Nationpoint, 706 F. Supp. 2d 408, 415-416 (S.D.N.Y. 2010) (citing Faulkner and collecting cases).

I.   THE PARTIES

Plaintiffs Sharon and Rodney Simington, reside in Kingman, Arizona, and "own [and operative] a small business known as Paintball Uphoria" there. (SAC (Dkt. No. 45.) ¶ 5.)  The Simingtons bring their claims against the LFG Defendants and NAB only.  (Id.)  Plaintiff Akhtar Zamir, a New York resident, "owns a small business known as Norwalk Smoke Shop," which he operates in Norwalk, Connecticut.  (SAC ¶ 6.)  Zamir (and collectively with the Simingtons, "plaintiffs") brings his claims against all defendants.  (Id.)  Plaintiffs bring this action as a class action, on behalf of "All persons . . . who, from August 11, 2004 to the present, applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants."  (Id. ¶¶ 5-6, 82.)

LFG, a Delaware corporate headquartered in New York, and NLS, a New York corporation headquartered in the same, are engaged "in the equipment lease financing business." (Id. ¶¶ 7, 8.)  Plaintiffs allege that NLS is LFG's "affiliate [and] alter ego," as well as the "umbrella organization" over LFG and "many

4

other shell entities" engaged in the same leasing business.
(Id. ¶ 8.)  GLC is a corporation with its principal place of
business in Los Angeles, CA.  (Id. ¶ 9.)  Plaintiffs do not
allege the type of business in which GLC is involved, but allege
generally that the LFG Defendants along with GLC "supply
financing for the leasing of electronic point-of-sale ['POS']
equipment, such as ATM machines, cash registers, and credit card
processing equipment." (Id. ¶ 20.)

It is alleged that defendants Cohen, NLS's President and
CEO, Mezei, NLS's Chairman of the Board, and Krieger, NLS's Vice
President of Operations, "direct and control" NLS, LFG and their
associated shell entities such that they "worked in concert" to
cause the corporate entities to engage in the alleged fraudulent
scheme.  (Id. ¶¶ 10-13.)

NAB, a New York corporation with its principal place of
business in Farmingdale, New York, and Payment Systems, a
corporation operating out of California, are both "independent
service organizations" ("ISOs"), which provide "merchant card
services." (Id. ¶¶ 14, 15.)

II.  THE ALLEGED SCHEME TO DEFRAUD

Plaintiffs allege that the companies that provide lease
financing for the POS equipment "conspire" with the ISOs (who
process the payments) "to defraud merchants who have need of
such services" by offering them "lease equipment" through

"exorbitant inflated and unconscionable" leases. (SAC ¶¶ 16, 20, 23.) Specifically, it is alleged that under the leases at issue, "Defendants"[3] provide "lease equipment with a fair market value between $200 and $400 [] if purchased outright for lease payments between $100 and $200 [] per month over a period of 48 months," which totals approximately $4,800 and $9,600 in lease payments for the equipment. (Id. ¶ 23 (emphasis in original).) However, the financing entities and the processing entities purportedly work together--i.e., "conspire"--such that the "sales agents" who offer the electronic payment services from the ISOs simultaneously "offers the merchants a lease" for the equipment. (Id. ¶ 22; see also id. ¶¶ 31-36 (regarding defendants' alleged conspiracy).) According to plaintiffs, the ISOs' sales agents present the leasing of the equipment as a prerequisite for using the processing services--and are able to convince merchants to agree to the lease rates by "promis[ing] huge savings on the month cost of the ISO's processing services." (Id. ¶¶ 22, 24.)

III. THE ALLEGED FRAUDULENT LEASES

Merchants purportedly are presented with a one-page document, which "appears to be a complete document," but,

---

[3] The Court uses the term "Defendants" in quotation marks throughout the fact section because that is how they are referred to in the SAC, based upon plaintiffs' inability to obtain facts at this juncture sufficient to detail the acts and representations of each defendant, as discussed in Part III of the Discussion section infra.

according to the SAC, is only the first page of a four-page lease. (SAC ¶ 37.) The first page of the lease requires the merchants to assent to the fact that they have "read and agree[] to all terms and conditions contained" therein. (Id.) In addition, the page requires the merchant's "personal guaranty" as well as line for "signature of acceptance by Defendants." (Id. ¶ 38.) Plaintiffs allege (and concede) that the one page with which they are presented contains the inscription "page 1 of 4" in microprint on the bottom left of the page. (Id. ¶ 39.) According to plaintiffs, upon a dispute arising between "Defendants" and the merchants regarding payment for the services--i.e., over the "fine print" allegedly never disclosed on the additional three pages--"Defendants" point to the "1 of 4" inscription to indicate that the merchants should have "conducted an in-depth investigation on their own." (Id.)

In addition, plaintiffs allege that the sales agents (i.e., agents of "Defendants") fail to provide at the time of the signing either the signed one-page document or the four-page document that is the purported true and full lease. (Id. ¶ 40.) According to the SAC, defendants' agents inform the lessees that they will receive a copy by mail. (Id.) Upon receipt of the lease via mail (if at all, according to plaintiffs), the lease has "become irrevocable and non-cancelable for the entire term, usually 48 months." (Id.)

The purportedly "undisclosed" terms on the three pages of the lease that the merchants do not see until receipt via mail (if ever), include, inter alia, "onerous and unconscionable" terms, such as:

- "Defendants" may charge "significantly" more than those contained on the page the merchants signed;

- The merchants' bank accounts may be subject to "automatic electronic deductions";

- If the merchant does not give a specific advance notice of cancellation, "with buyout balloon payment," the lease continues "indefinitely";

- The merchants have a "absolute and non-cancelable" "obligation to pay Defendants";

- Levy late charges of 15%; and

- Require that litigation of disputes occur in New York or any other place where Defendants "maintain[] [their] principal office for administrating" the lease.

(SAC ¶¶ 43(a)-(c), (f), (i), (k).)

IV.   THE ALLEGED FRAUDULENT LEASING CONDUCT

It is alleged that after execution of the leases, "Defendants" charge a $4.95 monthly "loss and damage waiver" ("LDW") for each piece of equipment leased for any lessee who does not provide proof of insurance.  (SAC ¶ 49.)  Plaintiffs allege, however, that the lessees never have a chance to provide such proof because "Defendants" never request it.  (Id. ¶ 50.) "Defendants" allegedly charge additional unconscionable fees associated with the LDW "program," as well as for "property

taxes" and for the filing of the property tax payments.  (Id.
¶¶ 51-54.)

According to the SAC, upon default by the merchant-lessee,
"Defendants" proceed against the merchants' respective
guarantors "personally" and damage the guarantor's "personal
credit" and "consumer credit" scores.  (Id. ¶ 44.)  In addition,
"Defendants" proceed against the merchant-lessees by inundating
them with "collection letters" and harassing phone calls in
which they threaten to "disparage their personal credit reports"
and "obtain[] default judgments" against them.  (Id. ¶¶ 45-46.)

If the lessees do not comply with the lease terms,
"Defendants" commence collection suits in New York, regardless
of the merchant's residence or place of business.  (Id. ¶ 47.)

V.   PLAINTIFFS' ALLEGED TRANSACTIONS

A.   The Simingtons

In or about 2008, Mr. Simington allegedly "won" an NAB cash
register on eBay, and subsequently was contacted by "Chris," an
alleged NAB representative.  (SAC ¶ 55.)  According to
plaintiffs, Chris informed Simington that a "free trial of a
debit/credit card machine" accompanied the cash register, but
that Simington could not have the cash register without
accepting the free trial.  (Id.)  Chris purportedly enticed
Simington to agree to the free trial by saying that NAB would
provide a $750 "cash incentive" to the first 100 applicants.

(Id.)  It is alleged that Chris represented that Simington would incur a "per-transaction fee" for each credit/debit card payment of the greater of $0.75 or a 1.5 percent fee on the total value of each sale.  (Id. ¶ 57.)  Simington filled out the application and faxed it back to Chris, along with (as requested) a voided copy of a check "so that NAB would know where payments for debit and credit charges could be deposited."  (Id.)  Those representations, as set forth in the SAC, proved to be false. (Id. ¶¶ 55-57.)

Simington received the machine and began accepting debit/credit card payments at Paintball Uphoria, but came to realize that he had not received deposits for any of those payments in his account--or the $750 incentive payment.  (Id. ¶¶ 58, 60.)  On that realization, Simington attempted to contact Chris, but instead reached an employee named Natalie who told Simington that Chris "was never employed there."  (Id.)  She also informed Simington that he was ineligible to receive the $750 incentive because of the time-frame of his lease.  (Id. ¶ 60.)  Eventually, Simington spoke to an employee named Joshua about his missing payments who assured Simington that "he would take care of the matter."  (Id. ¶ 59.)

Thereafter, some--but not all--of the transactions appeared in Simington's account, but Simington saw that "Defendants" were charging him a per-transaction fee at a rate of over 20 percent.

(Id. ¶ 61.)   It is alleged that he also noticed that
"Defendants" began withdrawing money from his account in
"amounts ranging from $107.00 to over $200.00" as "Global Pay"
fees, in addition to the $35 monthly lease payments.  (Id.
¶ 62.)   Upon that realization, Simington tried to contact both
Nathalie and Joshua.  As to the former, it is alleged that her
number was out of service and as to the latter, Simington
allegedly was told that no Joshua worked at NAB.  (Id.)
Simington finally reached an NAB employee who he informed that
he would be returning the debit/credit card machine.  (Id. ¶
63.)   The NAB representative allegedly responded that if
Simington cancelled the agreement for the debit/credit card
processing services, he would face a $750.00 cancellation
charge.  (Id.)

     Plaintiffs allege that despite Simington's calls, NAB
continued making withdrawals from Simington's account.  (Id.
¶ 64.)   Accordingly, Simington implemented a stop-payment at his
bank, and the bank commenced an investigation.  (Id.)   It is
alleged that thereafter, Simington and members of his family
(including his children) received harassing phone calls, on one
of which Simington requested a copy of the lease.  (Id.)
Simington then received a copy of a lease between himself and
LFG, which he alleges contained a signature of his that "appears
to have been 'cut and pasted' from his original application

directly" to that contract.  (Id. ¶ 65.)  Eventually, it is
alleged that NAB began making unauthorized withdrawals for the
alleged amounts owed from Mrs. Simington's bank account.  (Id.
¶ 66.)

Finally, on or about October 17, 2009, Mr. Simington
allegedly received a dunning letter requesting $5,443.50 in
payments owed.  (Id. ¶ 67.)

B.   Plaintiff Zamir

It is alleged that on or about June 2009, an alleged
Payment Systems' sales agent (i.e., Samantha Malm) approached
plaintiff Zamir at his place of business, Norwalk Smoke Shop,
and offered him the ability to reduce his costs for credit card
processing if he switched to an agreement with Payment Systems,
along with an accompanying lease for the processing equipment.
(SAC ¶ 68.)[4]  According to the SAC, Malm provided Zamir with a
worksheet estimating his savings upon the switch at
approximately $189 per month.  (Id. ¶ 69.)  Zamir executed an
agreement with Payment Systems approximately six months later
(August 6, 2009), along with a Non-Cancellable Lease with GLC a
few days later (August 20, 2009).  (Id. ¶¶ 70-71.)  Five days
after executing the GLC lease, Zamir allegedly received a letter
from LFG--"an entity with whom he had no contract, no prior

_____

[4] Plaintiffs allege that the provider Zamir was using at the time he was
approached by Payment Systems' agent did not charge anything for the
processing equipment.  (SAC ¶ 68.)

relationship, and about which he knew nothing," confirming that
they "provided lease financing for certain equipment," and
notifying him of the LDW fee.  (Id. ¶ 72.)

Upon receipt of his first bank statement after entering
into the agreements, Zamir saw charges from Payment Systems that
exceeded those from his previous provider by $200.  (Id. ¶ 73.)
It is alleged that Zamir made calls to Payment Systems over a
three month period to complain about the overcharges--all of
which were for naught.  Accordingly, Zamir closed the bank
account from which amounts were being deducted by Payment
Systems.  (Id. ¶¶ 74-75.)

According to the SAC, on or about February 4, 2010, Zamir
received an invoice from LFG for various current and past
payments due in an amount of $431.04.  (Id. ¶ 76.)  Thereafter,
he allegedly received a July 30, 2010 "Demand for Payment" from
LFG, which claimed an "outstanding balance of $10,540.25," along
with a letter from LFG's alleged attorney stating that the
remaining lease payments were being accelerated such that
Norwalk Smoke Shop owed $7,267."  (Id. ¶ 77.)  Ten days later,
on August 10, Zamir allegedly received a "Final Notice" from LFG
for the $10,540.  (Id.)

On December 3, 2010, LFG commenced an action against Zamir
in Civil Court of the City of New York.  (Id. ¶ 78.)

Plaintiffs allege that the allegedly fraudulent lease transactions of which they complain are just two of countless nationwide.  (See id. ¶¶ 80-81.)

PROCEDURAL HISTORY

Plaintiffs commenced this action on August 12, 2010.  (See Dkt. No. 1 (complaint filed).)  After various extensions by stipulation of defendants' time to respond to the initial complaint, on November 15, 2010, defendants informed the Court that they had given notice to plaintiffs of their intention to file a motion to dismiss per the individual practices of Judge Marrero (who was presiding over the case at that time),[5] and that plaintiffs intended to file an amended complaint.  (Dkt. No. 9 at 1; see also Decl. of Mitchell M. Breit in Support of Pls.' Appl. for Leave to Amend ("Breit Decl.")(Dkt. No. 70) ¶ 5.) Plaintiffs did so on May 11, 2011.  (Dkt. No. 11.)

Again after various stipulated extensions of time, defendants filed motions to dismiss the amended complaint on August 1, 2011.  (See Dkt. Nos. 21, 24, 29.)  At an August 9, 2011 "telephonic motion conference" with Judge Marrero regarding those motions, Judge Marrero "indicated that the thought Plaintiffs' RICO claim was insufficient."  (Breit Decl. ¶ 6; see

---

[5] This action was transferred to Judge Forrest on November 14, 2011.  (Dkt. No. 55.)

also Dkt. btw. Nos. 38 & 39.)  He did not make indications about the other claims in the amended complaint.  (Id.)

On September 15, 2011, plaintiffs filed the SAC, dropping their RICO claim.  (Dkt. No. 45; Breit Decl. ¶ 6.)[6]  Again by stipulation, motions to dismiss the SAC were filed by the LFG Defendants and by the GLC Defendants on November 14, 2011. (Dkt. Nos. 57 & 61.)  The motions were fully submitted as of January 16, 2012.

## DISCUSSION

### I.  LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc., 493 F.3d at 98 (quoting Bell Alt. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."  Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (quoting Twombly, 550 U.S. at 570). See also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949

---

[6] At an October 17, 2011, telephonic motion conference with Judge Marrero (for which there is no transcript), plaintiffs' counsel avers that Judge Marrero "indicated that he thought the claims were sufficiently well-pleaded." (Breit Decl. ¶ 6; see also Dkt. btw. Nos. 51 & 52.)  Defendants do not dispute that.  However, the Court does not consider Judge Marrero's "indication" a binding ruling, and thus, upon review of the SAC and the applicable caselaw, the Court finds that some claims in the SAC survive the instant motions to dismiss while others do not.

(2009) (same).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949.  In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action."  Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments, dismissal is appropriate.  Starr, 592 F.3d at 321 (quoting Iqbal, 129 S.Ct. at 1950).

## II.  CONSUMER FRAUD (COUNT ONE)

Plaintiffs' first cause of action purports to levy a claim for violations of 46 consumer fraud statutes.  (SAC ¶¶ 89-98.) Plaintiffs themselves, however, only plead connections to New York, Arizona and Connecticut.  (See id. ¶¶ 5-6.)  As both sets of moving defendants argue, plaintiffs could only possibly have standing to bring consumer fraud claims under the consumer fraud statutes of those three states.

Standing is "the threshold question in every federal case." Id. at 498.  Article III of the Constitution limits the jurisdiction of federal courts to the resolution of actual "cases" and "controversies," U.S. CONST. art. III, § 2--i.e., a justiciable action in which the plaintiff has standing, Warth,

422 U.S. at 498.  The law of Article III standing is clear:  a plaintiff must assert an injury traceable to the conduct of which the plaintiff complains.  <u>Allen v. Wright</u>, 468 U.S. 737, 750, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).  Accordingly, the Court need only consider whether plaintiffs adequately pleaded consumer fraud under New York's, Arizona's and Connecticut's statutes because defendants' alleged purported fraudulent scheme can only be traceable to the states in which plaintiffs have connections via residence or business.  (See SAC ¶¶ 5, 6, 90-91.)

Both sets of moving defendants argue that the New York General Business Law § 349 and Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522, claims fail because plaintiffs are not "consumers" nor do they allege "consumer-oriented" conduct. (Mem. of Law of LFG Defendants In Support of Their Mot. to Dismiss the SAC ("LFG Defs. Mem.") (Dkt. No. 62) at 11-12; Defs. Payment Sys.' & Global Leasing's Mem. of Law in Support of Their Mot. to Dismiss Pls.' Second Am. Compl. ("GLC Defs. Mem.") (Dkt. No. 59) at 11.)  The Court agrees.

Judge Gleeson's recent decision in <u>Sprit Locker, Inc. v. EVO Direct, LLC</u>, 696 F. Supp. 2d 296 (E.D.N.Y. 2010), is directly on point.  In <u>Spirit Locker</u>, the plaintiff--a liquor store--entered into an agreement with the defendant to process credit and debit card payments in exchange for a monthly fee.

Id. at 297-98.  Plaintiffs terminated the agreement early in the relationship due to "shoddy service and improper charges."  Id. at 298 (quotation marks omitted).  In turn, the defendant imposed an early termination fee ("ETF") provided for in the contract between the parties.  Id.  Plaintiff then brought an action alleging that the ETF was an unlawful penalty, and asserting claims for "deceptive practices" under N.Y.G.B.L. § 349 and unjust enrichment.  Id. at 297.  The Court found that plaintiff could not make out a prima facie case under § 349 because plaintiff "fail[ed] to allege consumer-oriented conduct."  Id. at 300.  The same is true here.  The Court finds Judge Gleeson's decision well-reasoned and persuasive--and adopts the portion of it relating to N.Y.G.B.L. § 349 in full herein.  See id. at 300-04.  Accordingly, the N.Y.G.B.L § 349 is dismissed.

Arizona's Consumer Fraud statute, Ariz. Rev. Stat. § 44-1522 requires the same "consumer-oriented" conduct.  See Dunlap v. Jimmy GMC of Tucson, Inc., 136 Ariz. 338, 344 (Ct. App. Of Ariz. 1983) ("The legislative intent behind the Consumer Fraud Act is to provide consumers with a claim for relief that is easier to establish than common law fraud." (emphasis

added)).  As discussed, no such conduct is alleged in the SAC.[7]
Thus, the Arizona consumer fraud claim fails as well.

The LFG Defendants argue that plaintiffs cannot sustain a
claim under the Connecticut Unfair Trade Practices Act, Conn.
Gen. Stat. § 42-110b ("CUTPA") because the SAC does not
sufficiently plead the elements of a CUTPA violation.  (LFG
Defs. Mem. at 12.)[8]

To state such a claim, "a plaintiff must establish both
that the defendant has engaged in a prohibited act and that, 'as
a result' of this act, the plaintiff suffered an injury."
Abrahams v. Young Rubicam, Inc., 240 Conn. 300, 692 A.2d 709
(1990).  A "prohibited act" is a deceptive practice that (i)
offends public policy; (ii) is immoral, unethical, oppressive,
or unscrupulous; and (iii) causes substantial injury to
consumers or other businesses.  Willow Springs Condominium
Ass'n, Inc. v. Seventh BRT Devel. Corp., 245 Conn. 1, 45 (1998).
However, a plaintiff need not plead all three elements.  A court
may find a CUTPA claim adequately pleaded based upon the degree
of one of the factors.  Cf. id.

The LFG Defendants disingenuously argue that the SAC
(a) does not plead facts that they "violated public policy" and

---

[7] Tellingly, although not dispositive, plaintiffs refer to themselves and the
purported class members as "merchants" throughout the SAC.  (See, e.g., SAC
¶¶ 24, 26, 28, 37.)
[8] The GLC Defendants' argument that the consumer fraud statutes apply to
consumers only (GLC Defs. Mem. at 11) fails upon CUTPA's application to other
businesses, as discussed in the text.

(b) only conclusorily pleads that they acted "immorally, unethically, oppressively or unscrupulously." (LFG Defs. Mem. at 12-13.)  The heart of the SAC is that defendants engaged in a widespread scheme to defraud business owners by purportedly misrepresenting the fees associated with lease financing and credit/debit card processing equipment and by providing them with one page of a purported four-page lease.  To state the facts underlying the CUTPA claim proves the point--i.e., plaintiffs sufficiently allege facts which, taken as true on this motion, plead immoral, unethical or unscrupulous behavior that violate the widely understood public policy of good faith and fair dealing in business transactions.  See Willow Springs Condominium Ass'n, Inc., 245 Conn. at 45.

This case is not like Flemming v. Goodwill Mortgage Services, LLC, 648 F. Supp. 2d 292 (D. Conn. 2009) (cited in LFG Defs. Mem. at 13) in which the complaint contained a single conclusory statement regarding the defendant's behavior (i.e., a recitation of the second element of the CUTPA claim).  Id. at 297.  Nor is this case like those cited by the LFG Defendants where the defendant "simply tried to walk away from a contract" or acted negligently.  (See LFG Defs. Mem. at 13 (citing Int'l Brands USA, Inc. v. Old St. Andrews Ltd., 349 F. Supp. 2d 256, 263-64 (D. Conn. 2004); A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 213-17 (Conn. 1990)).)  Taking the SAC's

allegations as true, defendants' alleged fraudulent practices fall within CUTPA's purview.[9]

Where plaintiffs themselves do not state a claim under their respective state's consumer statutes, however, they do not have standing to bring claims under other state statutes--even where they are named plaintiffs in a purported class action. See Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing . . .").  Plaintiffs do not have an injury traceable to conduct that occurred in any other state than those in which they conduct business and thus, they cannot assert a claim under those states' consumer fraud statutes.  See In re Direxion ETF Trust, No. 09 Civ. 8011, 2012 WL 259384, at *6-7 (S.D.N.Y. Jan. 27, 2012) (Forrest, J.) (dismissing claims for which named plaintiffs did not have an injury traceable to defendants' conduct); Parks v. Dick's Sporting Goods, Inc., No. 05 Civ. 6590, 2006 WL 1704477, at *2 (W.D.N.Y. June 15, 2006) (plaintiff lacked standing "to assert

---

[9] The LFG Defendants' arguments in the alternative as to whether the CUPTA claim is based upon the alleged fraud or the alleged breach of contract likewise fail.  They argue that they did not "have a duty to disclose" and thus, the alleged failure to disclose cannot form the basis for the CUTPA claim.  (LFG Defs. Mem. at 13.)  Taking the allegations as true, even if the LFG or GLC Defendants did not specifically make disclosures to plaintiffs, it is alleged that their agents did which, as discussed in connection with the Court's discussion of the fraud claim in Part III infra, is sufficient at this time.  In the alternative, the LFG Defendants argue that "a mere breach of contract does not establish a violation of CUTPA."  (Id. (quotation marks and citation omitted).)  But plaintiffs' consumer fraud violations are not duplicative of their breach of contract claim; they mirror a claim of fraud, which may lie independently with a consumer fraud claim.

state-law claims arising under the laws of states other than New York, since he was never employed by defendant anywhere other than New York"). Plaintiff Zamir, who owns a business in Connecticut, may represent the interests only of purported class members who are business owners or residents of Connecticut. See In re Direxion ETF Trust, 2012 WL 259384, at *7.

Both the N.Y.G.B.L. § 349 and Ariz. Rev. Stat. § 44-1522 claims are dismissed with prejudice.

Count One survives as to CUTPA only, and is dismissed to the extent plaintiffs seek to bring claims under the consumer fraud statutes of any other state.

III. COMMON LAW FRAUD (COUNT TWO) AND BREACH OF CONTRACT (COUNT SEVEN)

Claims for breach of contract and fraud arising out the same facts typically cannot be sustained in the same action. See Krantz v. Chateau Stores of Canada, 256 a.d.2D 186, 187 (1st Dep't 1998). That is not an inflexible rule, however. Where, as here, the bases for--or "essence" of--the two claims are substantially different they may be maintained, even though they arise out of the same set of facts.

First, the essence of the fraud claim is "fraud in the inducement." Plaintiffs allege, inter alia, that defendants made "misrepresentations and omissions of fact" that were material to plaintiffs' "decisions to apply for and lease credit

card processing equipment," and that at the time that they made
those misrepresentations, "Defendants" and/or their agents knew
that they were false.  (SAC ¶¶ 100, 101.)  Those allegations, on
the SAC's factual background, are sufficient to state a claim
for fraud in the inducement.  See Johnson v. Nextel Commc'ns,
Inc., 660 F.3d 131, 143 (2d Cir. 2011) ("To state a claim for
fraud in the inducement [under New York law], the party must
allege: (i) a material misrepresentation of a presently existing
or past fact; (ii) an intent to deceive; (iii) reasonably
reliance on the misrepresentation . . .; and (iv) resulting
damages.").

    Both the LFG and GLC Defendants contend that the fraud
claim fails because plaintiffs fail to plead various elements of
fraud--and the "group pleading" in the SAC fails to meet the
heightened standards set forth under Fed. R. Civ. P. 9(b).
Without going into lengthy detail as to each ground by each set
of defendants, suffice it to say that the allegations adequately
support a fraud claim.  The fact that plaintiffs have been
unable to identify specific acts and representations by each
specific defendant is of no moment.  "The very nature of the
scheme, as alleged, gives rise to the reasonable inference" that
all defendants (including defendant officers who held "key
positions") "were involved in the fraud."  Pludeman v. N.
Leasing Sys., Inc., 10 N.Y.3d 486, 493, 860 N.Y.S.2d 422, 890

N.E.2d 184 (N.Y. 2008).[10]  To strictly construe Rule 9(b)'s
pleading requirements especially where, as here, "concrete facts
are peculiarly within the knowledge of the party charged with
the fraud," would "work a potentially unnecessary injustice."
Id. at 491-92 (quotation marks and citations omitted).

    Second, the essence of the breach of contract claim is a
breach of the implied covenant of good faith and fair dealing
inherent in every contract.  (SAC ¶ 131.)  See Nat'l Mkt. Share,
Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir.2004)
("In New York, breach of the implied duty of good faith and fair
dealing is merely a breach of the underlying contract."
(quotation marks and citations omitted)).  The alleged
"wilfull[] and systematic[] conceal[ment]" of the terms of the
contracts from the lessees (SAC ¶ 130) certainly flouts the
"pledge" by contracting parties that neither of them "shall do
anything which will have the effect of destroying or injuring
the right of the other party to receive the fruits of the
contract."  511 West 232nd Owners Corp. v. Jennifer Realty Co.,

---

[10] Plaintiffs cite the New York Court of Appeals' Pludeman decision, arguing
that there, the court "held that lessees like Plaintiffs had pleaded a fraud
claim with sufficient particularity where they alleged virtually the same
facts alleged in this case." (Pls. Opp'n at 17.)  The Court has spent
considerable time comparing the facts alleged here and in Pludeman.  The
similarities are uncanny--i.e., there is nothing "virtual" in their
similarity.  As discussed below, the actions are identical (including as to
most parties and claims) except for the presence of additional defendants
here.  However, the Court does not decline to exercise its jurisdiction over
this action for the reasons discussed in note 11 infra.  This Court will take
up whatever additional implications may arise from those overlapping
allegations and parties at the appropriate time.

98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496 (2002)
(quotation marks and citations omitted).  The "fruits" of the
contracts that were touted here was credit/debit card processing
and equipment for substantial savings.  The alleged "exorbitant
and unconscionable" undisclosed fees and costs "destroyed or
injured" plaintiffs-lessees' rights to receive those fruits.
Thus, a breach of contract claim may lie.[11]

On the facts alleged, plaintiffs have asserted a breach of
contract claim independent from the bases for their fraud claim.
See 37 Am. Jur. 2d Fraud and Deceit § 324 (2012) ("It is
elementary that where a contract or transaction was induced by
false representations, the representations and the contract are

---

[11] As one of three grounds for dismissal, the LFG Defendants argue that the
breach of contract claim must be dismissed because there is a similar "prior
action pending" in New York Supreme Court, Pludeman v. Northern Leasing
Systems, Inc., Index No. 101059/2004 (N.Y. Sup. Ct.).  (LFG Defs. Mem. at
19-20.)  In other words, the LFG Defendants are asking this Court to abstain
from exercising its jurisdiction under Colorado River Water Conservation
Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.E.2d 483 (1976).
The Court has closely scrutinized this action and Pludeman and finds the
allegations nearly identical.  Colorado River abstention may have been
appropriate here absent the presence of additional defendants LFG, GLC, NAB,
Payment Systems and Mezei in this action--and the factual questions as to
whether NLS, a defendant in Pludeman, is the "alter-ego" of LFG, NAB, and
others--i.e., the non-defendants in Pludeman.  Abstention from jurisdiction
here would prevent plaintiff from adequately asserting and/or protecting
their rights against those additional parties.  Given that reality and the
Court's "virtually unflagging obligation" to exercise the jurisdiction given
to it, Colorado River, 424 U.S. at 817, abstention would not be appropriate.

In addition, plaintiffs concede that they are class members in Pludeman (but
note that there is a pending, but not fully-briefed motion for
decertification).  (See Pls. Opp'n at 43-44.)  To the extent that decisions
in Pludeman come to have preclusive effect over any of the claims asserted
here (not just the breach of contract claim because, based upon the Court's
own research, it is clear that there also are claims for fraud and money had
and received and punitive damages pending in Pludeman), the parties are
directed to notify the Court and the Court will take appropriate action.

distinct and separable."). Accordingly, defendants' motions to dismiss those claims (Counts Two and Seven) are denied.

IV.  UNJUST ENRICHMENT (COUNT THREE)

To state a claim for unjust enrichment, a plaintiff must plead that the defendant was enriched at the plaintiff's expense such that "equity and good conscience militate against permitted defendant to retain what plaintiff is seeking to recover." Ashland Inc. v. Morgan Stanley & Co., Inc., 652 F.3d 333, 339 (2d Cir. 2011) (quotation marks omitted). Unjust enrichment is based upon a quasi-contract theory--i.e., it is an equitable creation, designed to "prevent injustice, in the absence of an actual agreement between the parties concerned." IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2009). Sensibly, where there is "a valid and enforceable written contract governing a particular subject matter," a party may not also seek redress under an unjust enrichment theory based upon the same "events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Is. R. R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).

Both sets of moving defendants seek to dismiss the unjust enrichment claim precisely on that ground--i.e., that the contracts at issue govern the subject matter of this action. (LFG Defs. Mem. at 20-21; GLC Defs. Mem. at 13-14.) Plaintiffs counter that they may sustain both causes of action, but "may

26

not be able to collect a judgment for both breach of contract
and quasi-contract." (Pls. Opp'n at 37.) But in pleading their
unjust enrichment claim, plaintiffs specifically reference the
contracts at issue: "In exchange for the payments they made for
the leases, and at the time [they] made these payments,
Plaintiffs and the Class expected that the equipment lease
<u>contracts</u> were disclosed in full, that they would pay reasonable
rates, and that Defendants had provided all of the necessary and
accurate information and disclosed all of the <u>lease contract's</u>
terms." (SAC ¶ 107 (emphases added).) Plaintiffs make similar
allegations in asserting their breach of contract claim (Count
VII)--<u>i.e.</u>, that defendants "charg[ed] and collect[ed] sums in
excess of those specified in the equipment lease and
applications" and "impos[ed] different terms on the lease and
contract than those promised and revealed to Plaintiffs and
class members." (SAC ¶ 129.) There is no need for two separate
claims, both seeking redress for the alleged "exorbitant and
unconscionable" amounts defendants allegedly charged plaintiffs
against the terms of the lease equipment contract initially
presented to plaintiffs.[12] The unjust enrichment claim is
dismissed with prejudice.

---

[12] Plaintiffs' reliance on <u>Joseph Sternberg, Inc. v. Walber 36th St. Assocs.</u>,
187 A.D.2d 225, 594 N.Y.2d 144 (1st Dep't 1993) (cited in Pls. Opp'n at 37)
is inapposite. There, the First Department held that "where there is a bona
fide dispute as to the existence of a contract or where the contract does not
cover the dispute in issue, plaintiff may proceed upon a theory of quantum

27

V.   DECEIT, FRAUD AND/OR MISREPRESENTATION (COUNT FOUR)

The Court finds the deceit, fraud and/or misrepresentation claim (Count Four) duplicative of plaintiffs' common law fraud claim (Count Two).  See Fink v. Time Warner Cable, --- F. Supp. 2d ---, 2011 WL 6747463, at *6 & n.1 (S.D.N.Y. Dec. 23, 2011) (reciting the elements of common law fraud under New York law in analyzing a claim for "deceit, fraud and/or misrepresentation"). There is no need for it to lie as an independent cause of action as it rises and falls on the same bases as the fraud claim. Accordingly, Count Four is dismissed with prejudice.

VI.  NEGLIGENT MISREPRESENTATION (COUNT FIVE)

The sine qua non of a negligent misrepresentation claim is that the defendant had a duty--as a result of a special or privity-like relationship--to provide correct information to the plaintiff.  See Naughright v. Weiss, --- F. Supp. 2d ---, 2011 WL 5835047, at *6 (S.D.N.Y. Nov. 18, 2011); Sykes v. RFD Third Ave. 1 Assocs., LLC, 15 N.Y.3d 370, 372, 912 N.Y.S.2d 172, 938 N.E.2d 325 (N.Y. 2010) ("a plaintiff in an action for negligent misrepresentation must show  either privity of contract between the plaintiff and the defendant or a relationship so close as to approach that of privity." (quotation marks omitted)).

---

meruit and will not be required to elect his or her remedies."  Joseph Sternberg, Inc., 187 A.D.2d at 228, 594 N.Y.2d at 146.  Neither of those exceptions applies here.

No such relationship is alleged here and the alleged contracts do not provide the requisite "special relationship." Naughright, 2011 WL 5835047, at *6 ("To allege a special relationship, [the plaintiff] must establish something beyond an ordinary arm's length transaction . . ."). The obligation of defendants and/or their agents to provide "correct" information to plaintiffs-lessees arose out of the covenant of good faith and fair dealing implicit in every contract, not out of some sort of "special relationship." There is nothing approximating "privity" as between the parties prior to the time of contracting, nor could such privity be alleged on the arm's length transactions at the heart of plaintiffs' claims.

Accordingly, the claim for negligent misrepresentation is dismissed with prejudice.

VII. CONVERSION (COUNT SIX)

A claim for conversion is adequately pleaded where the plaintiff alleges (a) "a possessory right or interest in the property;" and (b) "defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." Colavito v. N.Y. Organ Donor Network, Inc., 860 N.E.2d 713, 717 (N.Y. 2006). "Interference with a plaintiff's right to possession may be by a wrongful: (i) taking; (ii) detention; or (iii) disposal." Amusement Industry, Inc. v. Midland Avenue

Assocs., LLC, --- F. Supp. 2d ---, 2011 WL 3463117, at *16
(S.D.N.Y. Sept. 27, 2011) (quotation marks omitted).

Such a claim is adequately alleged against the GLC
Defendants.[13]  Plaintiffs allege that both Payment Systems and
GLC made repeated withdrawals from plaintiff Zamir's personal
bank account for amounts which he purportedly did not authorize.
(SAC ¶¶ 73-75.)  If true, that certainly amounts to interference
with plaintiff Zamir's rights to his monetary property by a
taking.

There are not similar allegations against the LFG
Defendants in the SAC.  To save the claim against those
defendants, plaintiffs argue that New York law allows for a
claim of aiding and abetting conversion, and the "conspiracy"
allegations impute NAB's improper takings from both the
Simingtons' personal bank accounts to the LFG Defendants.  (Pls.
Opp'n at 39.)  But plaintiffs do not assert an aiding and
abetting conversion claim in the SAC, and they cannot amend
their complaint now with statements in opposition to the motions
to dismiss.  See Granata v. Berson, No. 11 Civ. 689, 2011 WL
6034366, at *4 (S.D.N.Y. Dec. 5, 2011) (Forrest, J.).

Accordingly, the conversion claim is dismissed as against
the LFG Defendants at this time.  If in discovery adequate

---

[13] The conversion claim likewise is adequately pleaded against NAB, who has
not moved to dismiss any claims against it.  (See SAC ¶¶ 62, 64, 66.)

evidence reveals that any of the LGF Defendants engaged in the allegedly unauthorized withdrawals from the lessee-merchants' respective bank accounts, plaintiffs may seek leave of Court to renew this claim against any of the LFG Defendants.

The LFG Defendants' motion to dismiss the conversion claim is granted; the GLC Defendants' motion to dismiss the conversion claim is denied.

VIII.   LEAVE TO AMEND

Plaintiffs have requested leave to amend any dismissed claims.  As set forth above, the Court has dismissed claims for which there are no allegations that would adequately set forth a claim for relief--*i.e.*, any amendment of the dismissed claims would be futile.  Accordingly, plaintiffs' request for leave to amend is DENIED.

The SAC will remain the operative pleading in this action. The parties will proceed with the guidance of this Opinion & Order to inform them of what claims remain in this action.

CONCLUSION

For the aforementioned reasons, defendants' motions are GRANTED IN PART and DENIED IN PART.

Plaintiffs' claims for unjust enrichment (Count III), "deceit, fraud and/or misrepresentation" (Count IV), and negligent misrepresentation (Count V) are dismissed with prejudice.

In addition, plaintiffs' consumer fraud claim is dismissed with prejudice as to the consumer fraud statutes of any state other than Connecticut (Counts I).  Plaintiff Zamir may proceed with the CUTPA claim on behalf of purported class members with standing for that claim.

Plaintiffs' conversion claim against the LFG Defendants (Count VI) is dismissed without prejudice.  Plaintiffs may seek leave to reinstate the conversion claim against the LFG Defendants, at the appropriate time, if discovery demonstrates that those defendants have engaged in behavior sufficient to sustain such a claim.

The surviving claims are consumer fraud under CUTPA (Count I), common law fraud (Count II), conversion as to GLC and Payment Systems (and NAB) (Count VI), and breach of contract (Count VII).

Plaintiffs' request for leave to amend the SAC is DENIED as futile.

The parties are to appear for an initial pretrial conference in this matter on March 15, 2012 at 10:00 a.m.  The parties should comply with Judge Forrest's Individual Practices for Civil Cases relating to initial pretrial conferences.

The Court is inclined to coordinate discovery in this action with discovery in the related action of Teague v. Lease Finance Group, et al., 11 Civ. 8125.  The initial pretrial

conference in that action is set for the same date and time.
The parties should all be prepared to discuss possible
coordinated discovery as between these two actions, and should
submit a joint proposed Scheduling Order.

The Clerk of Court is directed to terminate defendants'
respective motions (Dkt. Nos. 57 & 61).

SO ORDERED:

Dated: New York, New York
       February 28, 2012

_____
            Katherine B. Forrest
            UNITED STATES DISTRICT JUDGE

33