USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **DEC 1 4 2012**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                       :
RODNEY SIMINGTON and SHARON       :
SIMIMGTON, d/b/a PAINTBALL UPHORIA,  :
and AKHTAR ZAMIR, d/b/a NORWALK    :         10 Civ. 6052 (KBF)
SMOKE SHOP, on behalf of themselves and all :
others similarly situated,            :
                       :
              Plaintiffs,   :
                       :
        -v-                  :
                       :
LEASE FINANCE GROUP, LLC, <u>et al.</u>,    :
                       :
             Defendants.  :
-------------------------------------------------------------X     11 Civ. 8125 (KBF)
                       :
ROBERT AVILA D/B/A CONSTANTINE    :     <u>OPINION & ORDER</u>
CREATIONS; AND MACHELLE         :
SCHOMAKER D/B/A THING-A-MA-JIGS, on :
behalf of themselves and all others similarly :
situated,                   :
                       :
              Plaintiffs,   :
                       :
        -v-                  :
                       :
LEASE FINANCE GROUP, LLC, <u>et al.</u>,    :
                       :
             Defendants.  :
-------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      In two separate (but related) putative class actions commenced on September

15, 2010, and November 10, 2011, respectively, several small business owners seek

redress from various defendants involved in providing merchant credit card services

1

and leasing of credit card swiping equipment.[1]  In the first-filed action, plaintiffs Rodney and Sharon Simington, and Akhtar Zamir allege that Lease Finance Group, LLC ("LFG"), Northern Leasing Systems, Inc. ("NLS"), Global Leasing Company, Inc. ("GLC"), Jay Cohen, Leonard Mezei, Sara Krieger, North American Bancard Systems, LLC ("NAB"), and Payment Systems, Inc. ("PSI"), were involved in a fraudulent scheme involving merchant card services and associated equipment leasing (the "Simington Action").  In the second, related action, plaintiffs Robert Avila and Machelle Schomaker (the "Avila plaintiffs" or "plaintiffs") sued LFG, NLS, and Cohen, Mezei, and Krieger as well as Lease Source-LSL, LLC, Lease Source, Inc., MBF Leasing LLC, Encore Payment Systems, LLC, Merchant Services, Inc., Universal Merchant Services LLC, and Trans Tech Merchant Group,[2] for a similar fraudulent scheme involving merchant card services and leasing of credit card "swiping" machines (the "Avila Action").[3]

Now before this Court is an omnibus motion by the Avila plaintiffs only[4] for class certification, for appointment as class counsel, and to amend the operative

---

[1] These actions are two of a number of actions pending nationwide--in both federal and state courts--against these and other defendants for the same type of fraudulent scheme and/or allegedly unconscionable conduct.

[2] There are differences between the Leasing Defendants named in the Avila Action and those named in the Simington Action.  The Avila Action does not assert claims against Global Leasing Company, Inc., North American Bancard Systems, LLC, and Payment Systems Inc.  It does, however, assert claims against Lease Source-LSL, LLC, Lease Source Inc., MBF Leasing LLC, and Encore Payment Systems, LLC, which the Simington plaintiffs do not.

[3] On April 3, 2012, plaintiffs withdrew Sarah Teague as a named plaintiff and class representative and dismissed her claims against Lease Source, Inc. and Encore Payment Systems, LLC with prejudice.  (See ECF No. 48.)  In an order dated May 30, 2012, this Court removed Teague's name from the caption.  (ECF No. 59.)

[4] The Simington plaintiffs are not seeking class certification.

Avila complaint.  (See Pls.' Mem. Law Supp. Mot. Class Cert. ("Pls. Mem.") at 2,
ECF No. 81).

The Avila plaintiffs move for "certification of their claims for breach of
contract and conversion" only as to both the Leasing and Merchant Defendants.
(Pls. Mem. at 1.)  In that regard they are seeking certification of the following class:

> All persons (including natural persons, corporations, partnerships, or
> other legal entities), who, from January 1, 2006 to the present,
> contracted for merchant card services and/or equipment leasing with
> any of the Defendants.

There are a number of issues with certifying the proposed class.

First, the Court is unable to certify a class as to claims not pled in the
operative complaint.  That implicates the current motion in two ways.  As an initial
matter, neither of the Avila plaintiffs has a breach of contract claim as to Merchant
Services, Inc. and Universal Merchant Services LLC (the "Merchant Defendants").
Although plaintiffs' omnibus motion seeks to amend the current Avila complaint a
second time to add such a claim, plaintiffs fail to meet their burden to be able to do
so.

In addition, although plaintiffs seek certification of a class as to their breach
of contract claim (as well as their conversion claim, discussed below) against MBF
Leasing ("MBF"), LFG, NLS, Lease Source-LSI, LLC, Cohen, Mezei, and Krieger
(collectively, the "Leasing Defendants" and with the Merchant Defendants,
"defendants"), it is clear from plaintiffs' submissions (as well as statements made at
oral argument) that plaintiffs are seeking certification on a new theory--the leases'
unconscionability--not on their breach of contract claim as pled.  Even though the

3

operative <u>Avila</u> complaint refers to the provisions that plaintiffs now assert undergird an unconscionability claim, the complaint does not in fact plead such a claim--nor have plaintiffs ever asserted prior to this motion (on any of the motions the Court has resolved in the <u>Avila</u> or <u>Simington</u> Actions) that it does.  It is worth noting that plaintiffs' instant motion to amend does not seek to add an unconscionability claim--only one for breach of contract as to the Merchant Defendants.[5]  As to the contract claim against the Leasing Defendants, plaintiffs' class certification motion is defective before it leaves the starting gate.

Second, even if this Court were to allow an amendment to add such a theory, or (as plaintiffs' counsel suggested at oral argument) to read the current breach of contract claim broadly as a generalized claim "sound[ing] in contract," an unconscionability claim on the record before the Court is not amenable to class treatment.

The Court is then left with the conversion claim, pled only as to the Leasing Defendants.  As to that claim, liability is necessarily based on individualized facts: were unauthorized amounts taken from a plaintiffs' bank account?  Or, did duly authorized contractual agreements allow for any amounts withdrawn?  As set forth

---

[5] In this Court's motion to dismiss decision in <u>Simington v. Lease Fin. Grp., LLC</u>, 10 Civ. 6052, 2012 WL 651130 (S.D.N.Y. Feb. 28, 2012), and in connection with the Court's discussion of the potential overlap between a fraud claim and a breach of contract claim, the Court found that a breach of contract claim could lie.  <u>Simington</u>, 2012 WL 651130, at *9-10.  There, the Court referred to allegations of "exorbitant and unconscionable" undisclosed fees and costs that could support a claim for a breach of the implied covenant of good faith and fair dealing implicit in every contract.  <u>Id.</u> at *10.  As clearly argued in their submissions on the <u>Avila</u> class certification motion, the <u>Avila</u> plaintiffs are <u>not</u> now alleging a breach of the covenant of good faith and fair dealing.  They are instead alleging that, in myriad ways, the contracts are unconscionable and therefore unenforceable. The essence of a breach of contract claim is that one party has performed under an enforceable contract and another has not--that is not the claim plaintiffs are pursuing here.

below, putative class members executed numerous varying leases, all providing for different withdrawal authorizations.

For the above reasons and those discussed more fully below, this Court finds that it would be inappropriate to certify a class on the conversion or breach of contract claims in the <u>Avila</u> Action.

Plaintiffs' motion for class certification is denied; plaintiffs' motion for appointment of class counsel is denied as moot; and plaintiffs' motion to amend is denied.  In addition, defendants' motion to strike is denied as moot.

I.    BACKGROUND

    A.    <u>Procedural History</u>

A brief review of the procedural history of this case is necessary to understand plaintiff's motion for class certification--and the claims for which plaintiffs seek certification.

Defendants in <u>Simington</u> made two separate motions to dismiss, which the <u>Simington</u> plaintiffs opposed.  The Court resolved the motion on February 28, 2012, after which the only claims that remained were those for common law fraud, breach of contract, and consumer fraud under the Connecticut Unfair Trade Practices Act ("CUTPA").  <u>Simington v. Lease Fin. Grp., LLC</u>, 10 Civ. 6052, 2012 WL 651130, at *12-13 (S.D.N.Y. Feb. 28, 2012).  The Court dismissed the claims for conversion, unjust enrichment, "deceit, fraud and/or misrepresentation," negligent misrepresentation, and consumer fraud under forty-five other state consumer fraud statutes.  <u>Id.</u>

By stipulation, the parties to both the <u>Simington</u> and <u>Avila</u> Actions agreed that the Court's rulings in <u>Simington</u> on defendants' respective motions to dismiss would apply to the <u>Avila</u> Action.  (<u>Avila v. Lease Fin. Grp.</u>, 11 Civ. 8125, ECF No. 55 ¶ 1 (Apr. 11, 2012) (the "April 11 Stipulation").)

On April 13, 2012, the Court granted defendant Trans Tech Merchant Group's ("TMG") motion to compel arbitration in the <u>Avila</u> Action, and stayed the action as to that TMG.  (<u>Teague v. Lease Fin. Grp.</u>, 11 Civ. 8125, Order, ECF No. 57.)

On May 30, 2012, the Court dismissed all claims in <u>Avila</u> against the Merchant Defendants for lack of personal jurisdiction.  <u>See</u> <u>Avila v. Lease Fin. Grp., LLC</u>, 11 Civ. 8125, 2012 WL 1948777 (May 30, 2012) ("<u>Avila I</u>").

In June 2012, plaintiff Avila (the only plaintiff in the <u>Avila</u> Action who had any alleged dealings with the Merchant Defendants) subsequently sought leave to amend the complaint in the <u>Avila</u> Action to add allegations sufficient for this Court to exercise jurisdiction over the Merchant Defendants.  The Court granted the motion, concluding that the proposed amended complaint contained sufficient jurisdictional allegations.  <u>See</u> <u>Avila et al. v. Lease Fin. Grp., et al.</u>, 11 Civ. 8125, 2012 WL 3165408, at *2-5 (July 31, 2012) ("<u>Avila II</u>").  In considering the question of the futility of amending the complaint, the Court determined that the proposed amended complaint stated plausible claims for common law fraud and negligent misrepresentation <u>only</u>.  <u>Id.</u> at *5-9.  The Court did not allow plaintiffs' claims for consumer fraud, false advertising, unjust enrichment, misrepresentation,

conversion, or breach of contract to proceed.  Id. at *5-9.  The Court accepted the proposed amended complaint (now the "Avila Amended Complaint") for filing, subject to the Court's findings on what claims could stand.

Thus, based upon the April 11 Stipulation[6] and the Court's decision in Avila II, the Avila Action is proceeding as to claims against all defendants for consumer fraud pursuant to California's and Oklahoma's state statutes (corresponding to the home states of Avila and Schomaker), and common law fraud, as well as for negligent misrepresentation against the Merchant Defendants, and breach of contract against the Leasing Defendants.

B.      Factual Background[7]

Plaintiffs Avila and Schomaker both own and run small businesses.  They assert that defendants are engaged in a nationwide scheme to defraud small business owners in connection with the provision of electronic payment processing services and the leasing of "swiping" machines.  (Avila Am. Compl. ¶ 23, 11 Civ. 8125, ECF No. 105.)  They assert that they and thousands of others signed standard form leases that contain unconscionable provisions.  (Id.; see also Decl. of Mitchell M. Breit ("Breit Decl.") Exs. 5, 6, 16, 10 Civ. 6052, ECF No. 80.)

Plaintiffs focus on the unconscionability of the leases at issue in their motion for class certification.  They assert that the leases are substantively

---

[6] The April 11 Stipulation made clear that in Avila, the claims pursuant to various state statutes for which these plaintiffs lacked standing, other state law advertising claims, unjust enrichment, deceit, negligent misrepresentation, and conversion were dismissed.  (Apr. 11 Stip. ¶ 4.)

[7] The factual background of the Avila Action is set forth in Avila I and Avila II.  See Avila I, 2012 WL 1948777, at *1; Avila II, 2012 WL 3165408, at *5-9.  The Court presumes familiarity with those decisions, and recounts only the facts relevant to the instant motion for class certification.

unconscionable--i.e., the "content of the contract" is grossly unfair to plaintiffs,

Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 122 (2d Cir. 2010)--and that

the process by which the putative class members entered into their respective leases

was "procedurally unconscionable"--i.e., plaintiffs entered into the contract without

"meaningful choice," id. at 121-22.  Both sides have submitted evidence that create

a factual record as to each of plaintiffs' assertions regarding unconscionability.  The

Court will review those assertions--and the facts relevant to each--seriatim.

 The relevant facts on plaintiffs' claim for conversion--i.e., that defendants

charged putative class members' higher than the agreed-upon fees and thus,

improperly converted class members' property to their own--are intertwined with

the claims regarding substantive unconscionability.  Thus, the Court addresses

those facts in its discussion of unconscionability.

### 1.    Substantive Unconscionability

 Prior to reviewing plaintiffs' contentions regarding the leases' substantive

unconscionability, the Court finds it important to note that Exhibit 7 to the Breit

Declaration ("Breit Exhibit 7"), prepared and submitted by plaintiffs in support of

the instant motion, is a spreadsheet detailing the various putative class members

and the features of their respective leases.[8]  (See Breit Decl. Ex. 7.)  Breit Exhibit 7

comprises over seven three-inch binders, contains 338,514 rows of information, and

numerous columns evidencing myriad variations of the features of each of putative

---

[8] Defendants moved to strike Breit Exhibit 7 and certain other evidence submitted by plaintiffs in
support of class certification.  (See 10 Civ. 6052, ECF No. 111; 11 Civ. 8125, ECF No. 87.)  At oral
argument the Court asked whether defendants were still pursuing that motion; defense counsel
responded, "I think not."  (Oral Arg. Tr. ("Tr.") 24:2-5, Nov. 29, 2012, 10 Civ. 6052, ECF No. 130.)
The Court therefore considers defendants' motion to strike abandoned and denies it as moot.

class member's lease.  (See generally id.)  As the Court noted at oral argument on

this motion, Breit Exhibit 7 is a "very difficult document for [plaintiffs] to live with .

. . in terms of the Wal-Mart v. Dukes case because it's got every difference known to

mankind . . . ."  (Oral Arg. Tr. ("Tr.") 5:11-13, Nov. 29, 2012, 10 Civ. 6052, ECF No.

130.)  In other words, Breit Exhibit 7 "highlight[s] all the[ ] differences" among the

putative class members (Tr. 5:15-16):  it does not support plaintiffs' arguments in

support of Rule 23 certification (certainly not in respect of commonality, typicality,

or predominance).  Given the size and complexity of Breit Exhibit 7, the Court

focuses upon the named plaintiff's leases in reviewing plaintiffs' assertions

regarding unconscionability.

      In addressing plaintiffs' unconscionability arguments, the Court also reviews

evidence submitted by defendants in opposition to plaintiffs' motion.[9]  That evidence

confirms that which the Avila and Schomaker leases reviewed below (as well as

Breit Exhibit 7) show: there are, in fact, numerous different lease forms.  (Compare

Breit Decl. Ex. 1 with Breit Decl. Ex. 2; see also Aff. of Lina Kravic in Opp'n to Pls.'

Mot. for Class Cert. ("Kravic Aff.") ¶ 19, 10 Civ. 6052, ECF No. 114.)  Defendants

have used a variety of different lease forms since 2006.  (Kravic Aff. ¶ 19.)  There

are approximately 367 different lease forms executed by the 389,040 lessee-putative

class members during the class period.  (Id.)  The leases vary from two to seven

pages in length; some leases require the lessee to sign and initial the first page, and

to initial each of the following pages as well.  (Id. ¶ 20.)  Not all leases contain the

---

[9] Plaintiffs do not contest the accuracy of any evidence put forward by defendants.  Rather, plaintiffs
argue that such evidence is not inconsistent with certifying the proposed class.

same provisions--and, even as to provisions which may have a similar purpose, there can be a wide variety of language used in the forms.  (Kravic Aff. ¶ 22; compare Breit Decl. Ex. 1 with Breit Decl. Ex. 2.)

The Court now turns to each of the various assertions plaintiffs have made regarding the substantive unconscionability of the leases--and the facts relating to each assertion.

First, plaintiffs assert that all class members have signed equipment leases that charge unconscionably high fees in relation to equipment value.  (See Pls. Mem. at 5.)  According to plaintiffs, the fair market value of Avila's equipment was $1,716 but his total lease payments over four years amounted to $9,119.52.  (Breit Decl. Exs. 1, 7.)  Schomaker's equipment had a fair market value of $350, but over time her lease payments amounted to $2,400.  (Breit Decl. Exs. 2, 7.)   In addition, Avila's lease bore a 26.55 percent "implicit" interest rate implicit while Schomaker's bore one at 25.58 percent.  (Breit Decl. Ex. 7.)

Second, plaintiffs assert that default provisions are draconian to the point of unconscionability (and thus, non-cancellable).  (See Pls. Mem. at 6-7.)  Here, Schomaker's contract provides that in the event of default the lessor is entitled to immediate repossession of the equipment and the payment of various expenses related, inter alia, to collection.  (Breit Decl. Ex. 2.)  Avila's contract contains a provision for payment of a "loss amount" in the event of default equal to the present value of future lease payments and a $250 fee to cover lessor's collection overhead.  (Breit Decl. Ex. 1.)

Third, plaintiffs assert that provisions relating to payment of property taxes are unconscionable--and that due to defendants' use of an incorrect formula, all lessees were commonly overcharged tax on the equipment.  (Pls. Mem. at 8.)  Avila's 2007 lease provides that lessee "shall pay all sales, use, excise, personal property, stamp, documentary, ad valorem, gross receipt, occupation, and other taxes" "imposed on ownership, possession, or use of" the equipment.  (Breit Ex. 1 ¶ 6.) Schomaker's lease requires the same, except does <u>not</u> impose gross receipt or occupation taxes upon the lessee.  (Breit Decl. Ex. 2 ¶ 11.)

In addition, plaintiffs assert that defendants charged class members a $25 fee relating to property tax filings.  A review of the various lease forms executed by putative class members demonstrates differences in this type of provision. Schomaker's lease contains language that states that she is responsible for "applicable taxes" plus "an administrative processing fee in the amount of $25.00" which "may provide us with a profit."  (Breit Decl. Ex. 2 ¶ 11; Kravic Aff. ¶ 37.) Defendants estimate that 81,000 leases executed during the class period contain similar language.  (<u>Id.</u> ¶ 38.)

Avila's lease did not disclose a $25 payment, but states instead that the "Lessor will add such taxes, fees and other charges to the monthly payments hereunder including handling and administration costs."  (Breit Decl. Ex. 1 ¶ 6; Kravic Aff. ¶ 39.)  Unlike Schomaker's lease, Avila's lease does not state a flat amount of $25 to be assessed as an administrative processing fee.  (<u>Id.</u>)  Defendants estimate that 217,000 leases executed during the class period contain language

similar to that in the Avila lease.  (Id.)  Whether putative class members were

charged such a fee at all varies as do how often class members were charged this fee

and the amounts charged.  (See Breit Ex. 7.)

Fourth, plaintiffs assert that the leases contain an unconscionable "insurance

non-compliance fee," requiring the lessees to purchase insurance to cover the value

of the equipment and the value of future lease payments.  (Pls. Mem. at 11.)  All

leases generally contain some type of such provision.  (See Breit Decl. Ex. 1 ¶ 9, Ex.

2 ¶ 14.)  As is clear from a comparison of Avila and Schomaker's respective leases,

however, the language of the insurance provisions differ and impose different

penalties.   (Compare Breit Decl. Ex. 1 ¶ 9 with Breit Decl. Ex. 2 ¶ 14.)

The various lease forms describe a lessee's obligations with respect to

insurance in different ways.  (Kravic Aff. ¶¶ 23-24.)  Failure to provide proof of

insurance on or before a particular deadline would--or could--result in the

imposition of a "loss damage waiver" ("LDW") fee of $4.95 per month.  (Breit Decl.

Ex. 1 ¶ 9, Ex. 2 ¶¶ 14-15.)  Schomaker's lease does have  the $4.95 monthly LDW

charge set forth on the first page of the lease; it also contains a provision that refers

the lessee to another portion of the contract that explains how a lessee may avoid

payment of such a fee by providing proof of insurance  (Id. ¶ 24.)  Of the 389,040

leases signed during the class period, 91,000 contain provisions relating to

insurance similar to that in Schomaker's lease.  (Id. ¶ 25.)  Avila's lease contains

different language with respect to insurance requirements, stating that the LDW is

required "as requested by the lessor" (Schomaker's lease does not contain such

language). (Id. ¶ 26.) Defendants have put forward evidence that in practice, they accept standard insurance certificates, naming the lessor as additional payee, as adequate proof of insurance. (Id. ¶ 27.) When an insurance certificate is received, the LDW is waived. (Id.) Defendants estimate that more than 40,000 lessees have avoided paying the LDW after providing proof of insurance. (Id. ¶ 30.) Schomaker called defendants after receiving a letter regarding the insurance requirement and was advised that she could send in an insurance certificate. (Id. ¶¶ 31-32.)

Avila's lease does not state the amount of LDW that would be charged in the absence of an insurance certificate. (Id. ¶ 33.) Defendants estimate that 205,000 leases executed during the class period contain a provision similar to that in Avila's lease. (Id.) Yet other leases have some of the language that Schomaker's lease has, but do not have the disclosure on the first page that Schomaker's lease has. (Id. ¶ 34.) Defendants estimate that 5,000 leases executed during the class period are of this variety. (Id.)

Some lessees have benefitted from payment of the LDW by obtaining replacement equipment. (Id. ¶ 28.) Of the leases entered into during the class period, more than 3,000 lessees have been able to obtain replacement equipment due to loss or damage. (Id.)

Defendants have also put forward uncontradicted evidence of wide variation in other provisions in putative class members' leases. For example, many leases, including Schomaker's (but not Avila's), contain a provision entitled "ABILITY TO OPT OUT" (in capitalized letters in the lease). (Kravic Aff. ¶ 41.) Pursuant to this

provision, even after executing a lease, lessees with leases containing an "opt-out" provision have seven days within which they may notify the lessor that he or she has thought better of the deal and does not accept the terms of the lease.  (Id.)  In some leases, this provision contains an additional period of ten days within which they may attempt to renegotiate their lease, after triggering the opt-out provision. (Id.)  Defendants have stated that a small number of lessees have taken advantage of this opt-out provision.  Certain leases state that they may be cancelled within three days of execution.  (Id. ¶ 42.)  Defendants estimate that 95,000 lease forms executed during the class period contain either an opt-out and/or cancellation provision.  (Id. ¶ 43.)

The leases of putative class members also differ in terms of provisions relating to possible waiver of jury trial or waiver of participation in a class action. (Id. ¶ 44.)  Certain leases include waiver of one but not the other, some include waivers with respect to both.  (Id. ¶ 44.)  Avila's lease, for instance, does not include a class action waiver, but does include a waiver of a jury trial.  (Id.)  Defendants estimate that 292,000 leases executed during the class period contain a jury trial waiver, buy only 96,000 contain a class action waiver.  (Id.)

In addition, certain leases contain specific limitations on when any action by a lessee must be brought.  (Id. ¶ 45.)  For instance, Schomaker's lease limits the time period within which she can bring a claim to within one year of the accrual of the cause of action.  (Id.; see also Breit Decl. Ex. 2 ¶ 21.)  Avila's lease does not contain a similar provision.  (Kravic Aff. ¶ 45.)  Defendants estimate that 196,000

leases executed during the class period contain a limitation on action of one year. (Id.)

                    2.      <u>Procedural Unconscionability</u>

Plaintiffs also assert that the manner and process by which members of the putative class entered into their respective leases (what plaintiffs call "contracts of adhesion") was procedurally unconscionable.  (Pls. Mem. at 14-15.)

Neither Avila nor Schomaker claims that they had no choice but to enter into the leases in question.  There is nothing else in the record demonstrating that all members of the putative class commonly lacked such effective choice.  Indeed, Schomaker cancelled her lease prior to opening her business and there is no allegation that such cancellation prevented her customers from using credit cards.

Defendants put forward evidence that the Leasing Defendants do not determine which equipment a lessees may choose for his or her business and whether he or she will finance that through a lease.  (<u>See</u> Kravic Aff. ¶¶ 6-7.)[10] Lessees discuss their options with a representative of an unaffiliated independent sales organization, and only after a choice of equipment and method of acquisition is made (sale vs. finance) do the Leasing Defendants get involved.  (<u>Id.</u> ¶¶ 6-7.) Typically, in connection with the execution of a lease, a lessee executes a "delivery and acceptance receipt" which "includes a written acknowledgment of the terms of the lease and confirmation that the equipment has been installed and is operating." (<u>Id.</u> ¶ 10.)

---

[10] As mentioned above, plaintiffs do not contest the accuracy of any of the evidence put forward by defendants.

The Leasing Defendants also have a verification procedure following the signing and acceptance of a lease: depending on the equipment vendor, the procedure often includes a verification call with the lessee, a Delivery & Acceptance Receipt or an installation certificate.  (Id. ¶ 12.)  According to defendants, there is one vendor who performs its own verification process and whose leases defendants accept; there is no evidence in the record that defendants control what that verification process entails.   (Id. ¶ 12, n 2.)

Thousands of lessees receive "verification calls" from the Leasing Defendants. (Kravic Decl. ¶ 13.)  During such a call, a representative from one the Leasing Defendants confirms that the lessee understands the terms of his or her lease, including the base monthly payment, that the equipment is installed and functioning properly, and that the lessee understands the terms of the LDW.  (Id.) During the class period, the Leasing Defendants made thousands of verification calls to putative class members.  (Id. ¶ 14.)  Such calls are recorded and have been since 2008.  (Id. ¶ 15.)

II.    LEGAL STANDARD

Litigating claims by way of a class "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548-49 (2011) (citing Califano v. Yamasaki, 442 U.S. 682, 700-702 (1979)).  To be certified, a putative class must meet all four prerequisites of Rule 23(a)--numerosity, commonality, typicality, and adequacy,

Fed. R. Civ. P. 23(a)[11]-- and those for at least one of the subsections of Rule 23(b).

<u>Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.</u>, 546 F.3d

196, 202 (2d Cir. 2008).  Here, plaintiffs seek certification of a Rule 23(b)(3) class for

monetary damages.[12]

The party seeking certification bears the burden of proving the Rule 23(a)

and Rule 23(b) requirements by a preponderance of the evidence.  <u>Novella v.</u>

<u>Westchester Cty.</u>, 661 F.3d 128, 149 (2d Cir. 2011).  The trial court must undertake

a "rigorous analysis" to determine whether plaintiffs have sustained their burden.

<u>Wal-Mart</u>, 131 S. Ct. at 2551.  Frequently such analysis "will entail some overlap

with the merits of the plaintiff's underlying claim"--and such overlap cannot be

avoided.  <u>Id.</u> at 2552.

For certification of a Rule 23(b)(3) class as plaintiffs seek here, the court must

determine that "questions of law or fact common to the class predominate over any

questions affecting only individual members," and that a class action is the superior

method of resolving the question of liability.  Fed. R. Civ. P. 23(b)(3).

## III.   DISCUSSION

---

[11] Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

[12] In their prayer for relief, plaintiffs recite a request for both monetary damages and injunctive relief (Am. Compl. "Prayer For Relief" ¶ C), and plaintiffs assert that "Whether Class Members are entitled to declaratory, injunctive or other equitable relief and, if so, what is the nature of such relief." is a question "common" to the class (Pls. Mem. at 30).  However, plaintiffs do not even attempt to demonstrate that they have met the requirements for certification of a Rule 23(b)(2) injunctive class; indeed, they do not refer to that rule at all in their papers.  Accordingly, the Court deems any claim for certification of an injunctive class abandoned.

Plaintiffs present two claims for which they seek to certify a class--i.e., conversion and breach of contract.  They have not met their burden for class certification as to either.

Defendants have not contested numerosity as to either claim.  Thus, the Court examines only the remaining Rule 23(a) and Rule 23(b)(3) requirements.

A.    Breach of Contract/Unconscionability

1.    Against the Merchant Defendants

As discussed above, there is no breach of claim against the Merchant Defendants pled in the Avila Amended Complaint.  This Court cannot certify a class to litigate a claim not pled.  Anderson v. U.S. Hous. & Urban Dev., 554 F.3d 525, 529 (5th Cir. 2008) ("[W]e hold that the district court abused its discretion by certifying a class based on claims not pleaded in the complaint.  The district court's authority to certify a class under Rule 23 does not permit it to structure a class around claims not pled."); cf. In re Canon Cameras, 237 F.R.D. 357, 358 n.1 (S.D.N.Y. 2006) ("[T]he plaintiffs' instant motion [for class certification] attempts to rely, in part, on factual allegations that were not pled in the Second Amended Complaint.  Accordingly, in considering the plaintiffs' instant motion, the Court has considered only those factual allegations pled in the Second Amended Complaint.").

Although plaintiffs have moved to amend their complaint a second time to add a breach of contract claim as to the Merchant Defendants, they have not attached a copy of a draft pleading to their motion papers nor do they even mention what allegations they would--or could--plead in support of such a claim--i.e., what

provision of any purported contract into which plaintiff Avila entered with the Merchant Defendants those defendants are alleged to have breached.  Indeed, they devote only one paragraph to their request.  Further, to the extent that plaintiffs are seeking to certify a class on a claim "sounding in contract"--<u>i.e.,</u> unconscionability--there is nothing in the few sentences in which plaintiffs seek leave to amend setting forth the allegations sufficient to plead an unconscionability claim against the Merchant Defendants.  Accordingly, the Court denies plaintiffs' motion to amend.

The failure to plead a contract claim against the Merchant Defendants is sufficient to defeat plaintiffs' motion for class certification on that claim as to those defendants.  <u>See</u> <u>Anderson</u>, 554 F.3d at 529.

2.      Against the Leasing Defendants[13]

a.      The Amended Complaint Does Not Plead
Unconscionability

Whether plaintiffs can meet their Rule 23 burden for an unconscionability

claim against the Leasing Defendants turns on the nature of the legal inquiry for

such a claim.

As an initial matter, the Avila Amended Complaint pleads only breach of

contract, not unconscionability.  Although the various contractual provisions that

plaintiffs refer to as "unconscionable" on this motion[14] are described in the Avila

Amended Complaint, they are not at the heart of plaintiffs' contract claim as pled.

Plaintiffs allege that the Leasing Defendants "engaged in a pattern and practice of

charging and collecting sums in excess of those specified in the equipment lease and

applications provided to Plaintiffs and class members and by imposing different

terms on the lease and contract than those promised and revealed to Plaintiffs and

---

[13] Plaintiffs and the Leasing Defendants agree that New York law applies to the contract claim--
regardless of whether it is a breach of contract claim or one for unconscionability.  (Pls. Mem. at 17;
Mem. Leasing Defs. Opp'n Pls.' Mot. Class Cert. at 18, 10 Civ. 6052, ECF No. 117.)

[14] Plaintiffs focus on the overall unconscionability of the leases as the primary wrongdoing to be
addressed in the class litigation and assert that:
- The Leasing Defendants charge lessees exorbitant fees--that is, that overall lease
  payments are far in excess of the stated original cost of the equipment;
- The leases are essentially non-cancellable because they contain *in terrorem*
  provisions such as accelerated payments, one-way attorneys fees and repossession of
  the equipment;
- The leases require a "loss damage waiver" or payment of an insurance fee;
- Property taxes in excess of those due may have been collected;
- The leases provide for payment of undue administrative fees in connection with
  payment of applicable taxes;
- The leases are in small print; and
- That the lessors have greater bargaining power--perhaps even rendering the leases
  non-negotiable.

(See Pls. Mem. at 19-26.)

class members." (Avila Am. Compl. ¶ 167.)  In other words, according to plaintiffs, by charging sums different than those specified in the leases, the Leasing Defendants breached the terms of the lease.  (See id. ¶ 168 ("Defendants breached those contracts.").)[15]

Although such sparse allegations barely pass muster under Fed. R. Civ. P. 8, they state a claim to the extent that plaintiffs could prove that they had been charged amounts in excess of those they had agreed to be charged.  For instance, if they agreed to be charged "x" per month and instead a higher amount, "y," was taken out of their bank accounts, such conduct could constitute a breach of the contract (and depending on the facts, conversion).  That, however, is not the claim upon which plaintiffs propose to proceed.  Indeed, they conceded as much at oral argument when they argued that they are not "bound by the labels that happen to be attached to the complaint" and encouraged the Court to read the breach of contract claim as one "sound[ing] in contract."  (Tr. 6:7-9.)  Plaintiffs' theory is that such a reading allows the Court to extend the breach of contract claim to include "unconscionability."

Plaintiffs' argument cannot withstand scrutiny.  As a matter of law, an unconscionable contract is unenforceable.  King v. Fox, 7 N.Y.3d 181, 191, 851 N.E.2d 1184 (N.Y. 2006).  A claim that a contract has been breached presupposes an enforceable contract.  As the Avila Amended Complaint clearly pleads (and as

---

[15] Plaintiffs further allege that such actions constituted a violation of the covenant of good faith and fair dealing.  (Id. ¶ 169.)  They likely included that allegation to meet the terms of the April 11 Stipulation, in that the Court allowed the breach of contract claim to stand in Simington because "the essence of the breach of contract claim is a breach of the implied covenant of good faith and fair dealing."  Simington, 2012 WL 651130, at *10.

plaintiffs' argued in opposition to the motion to dismiss in the <u>Avila</u> action (11 Civ. 8125, ECF No. 45; <u>see also</u> 10 Civ. 6052, ECF No. 71 at 40-41)), the Leasing Defendants purportedly breached the leases by not complying with their terms. (<u>See</u> <u>Avila</u> Am. Compl. ¶¶ 167-68.)  Plaintiffs have not pled an unconscionability claim.  Accordingly, the Court does not have "authority to certify a class under Rule 23 . . . around [a] claim[ ] not pled."  <u>See</u> <u>Anderson</u>, 554 F.3d at 529.

### b.   Rule 23 Requirements on an Unconscionability Claim

Even if the Court construed plaintiffs' contract claim as pled to encompass an unconscionability claim, plaintiffs have failed to meet their burden on the Rule 23(a) or Rule 23(b)(3) prerequisites for such a claim.

Under New York law, "a contract may be held invalid if it meets the standard for unconscionability--that is, 'if it is so grossly unreasonable or unconscionable in light of the mores and business practices of the time and place to be unenforceable as to its terms.'"  <u>Clinton v. Oppenheimer & Co., Inc.</u>, 824 F. Supp. 2d 476, 483 (S.D.N.Y. 2011) (quoting <u>Gillman v. Chase Manhattan Bank, N.A.</u>, 73 N.Y.2d 1, 10, 534 N.E.2d 824 (N.Y. 1988).)  To sustain an unconscionability claim, the plaintiff must demonstrate that the purported contract is both procedurally and substantively unconscionable.  <u>See</u> <u>Ragone</u>, 595 F.3d at 121-22.  "The terms of the contract must unreasonably favor one party over the other [substantive unconscionability] and the process of contract formation must have deprived the

disadvantaged party of meaningful choice [procedural unconscionability]." <u>Clinton</u>, 824 F. Supp. 2d at 483; <u>see also</u> <u>Ragone</u>, 595 F.3d at 121-22.

Procedural unconscionability "requires an examination of the contract formation process and the alleged lack of meaningful choice." <u>Gillman</u>, 73 N.Y.2d at 10-11.  That is, were the circumstances surrounding the formation of the contract so plainly unfair that the contract is unenforceable?  <u>See</u> <u>Clinton</u>, 824 F. Supp. 2d at 483.  Substantive unconscionability relates to the provisions of the contract itself. That is, whether the contract so disadvantages one side over the other that it would be grossly unfair to enforce it.  <u>See</u> <u>King</u>, 7 N.Y.3d at 191.

Here, plaintiffs assert that entry into the leases was procedurally unconscionable based upon (1) the difference in bargaining power as between plaintiffs and defendants, and (2) the small print in the contracts.  As set forth above, plaintiffs assert that the lease terms are substantively unconscionable, including that the contracts charged excessive amounts in relation to the fair market value of the equipment, that the tax payments including administrative processing fees in excess of actual costs, that the contracts required proof of insurance that would cover both the equipment and the lessee's failure to pay absent which the LDW fee would be imposed, and that the contracts contain *in terrorem* provisions that may inhibit or prevent lessees from terminating the contracts.  Such provisions include accelerated payments, payment of attorneys' fees and other costs, and turnover of the equipment.

As to procedural unconscionability, plaintiffs have offered no evidence regarding whether plaintiffs had the ability to choose among various providers of the credit card servicing and equipment.  In other words, plaintiffs have not even attempted to show that the process of contract formation deprived putative class members of "meaningful choice."  <u>Clinton</u>, 824 F.Supp.2d at 483; <u>see also</u> <u>Gilman</u>, 73 N.Y.2d at 10.  Indeed, the facts surrounding the Schomaker lease indicate that she did have choice: she apparently cancelled her contract prior to opening her business to the public, but there is no assertion that this prevented her later from engaging in credit card transactions.

In addition, plaintiffs do not even address the evidence that tens of thousands of putative class members' leases contained opt-out and/or cancellation provisions. The ability to opt-out, renegotiate or cancel a contract defeats any presumption that bargaining leverage and small print meant that plaintiffs had no choice or influence with respect to the terms of their leases.

### i.   <u>Commonality</u>

"Commonality" requires a showing that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This effectively requires the plaintiff to show that all members of the putative class suffered the same injury.  <u>Wal-Mart</u>, 131 S. Ct. at 2551.  Although a plaintiff need only show that class members "share a single question of law or fact in common," merely sharing a legal theory is insufficient to meet the commonality requirement because the same law can be violated in a number of ways.  <u>Wal-Mart</u>, 131 S. Ct. at 2551.  "That common

contention, moreover, must be of such a nature that it is capable of classwide resolution--which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

In the instant case, plaintiffs have failed to show that a single question of law or fact is common to the class. As discussed above, New York law provides that a contract be found to be both procedurally and substantively unconscionable before a plaintiff can prevail on such a claim.

Regardless of plaintiffs' inability to show procedural unconscionability as discussed above, there is no evidence in the record that the circumstances surrounding plaintiffs' contract formation were the same or even similar. Plaintiffs' showing on procedural unconscionability is based on an assertion that plaintiffs are less sophisticated than defendants and had less bargaining leverage, and that the leases are all in small print. These points, however, are not nearly enough.

First, the fact that plaintiffs as small business owners may not be as sophisticated as the lessors of certain equipment is not an unusual circumstance, Indeed, one would expect that as to photocopy equipment, restaurant equipment or other equipment that might be leased, the same could be true. This Court cannot hold that the mere fact that a small business owner is less sophisticated than the lessor necessarily require a finding of procedural unconscionability. See Morris v. Snappy Car Rental, Inc., 637 N.E.2d 253, 256-57 (N.Y. 1994); cf. Clinton, 824 F. Supp. 2d at 483. This is true even when one adds the fact that the leases were in small print. These defendants did not invent small-print contracts; and given the

ubiquity of small print contracts, this Court will not hold that that is itself a factor weighing strongly in favor of procedural unconscionability.

Second, each of the contracts states that it is an equipment financing lease subject to Article 2-A of the New York Uniform Commercial Code ("U.C.C."). (See Breit Decl. Exs. 1, 2.) Article 2-A requires that prior to finding unconscionability with respect to an equipment finance lease, there must be a hearing. N.Y. U.C.C. § 2-A-108(3). At a section 2-A-108(3) hearing, the parties are entitled to present evidence regarding the circumstances surrounding the making of the contract. Although this provision does not state that the hearing cannot be by way of class action or a grouping of plaintiffs (it is silent on those topics), the suggestion of presentations regarding the circumstances surrounding the negotiation of the contract can only reasonably occur on an individualized and not class basis.[16]

Plaintiffs do not contest that the U.C.C. applies to these leases. (See Pls. Reply Mem. Law Supp. Mot. Class Cert. at 8, 10 Civ. 6052, ECF No. 121.) Instead, they argue that whether or not the leases are subject to it is a common question. (Id.) The Court disagrees. "[D]etermination of [the] truth or falsity" of whether-- and how--the U.C.C. applies to the leases is not capable of resolution "in one stroke." See Wal-Mart, 131 S. Ct. at 2551. Further, plaintiff's argument fails to address the UCC's requirement for a hearing with respect to the circumstances regarding contract negotiation (that is, a hearing on procedural unconscionability)-- and how this could be done on anything other than an individualized basis. In

---

[16] It is possible that factual situations could exist in which the process of contract formation is demonstrated to be uniform. In such a case, it is conceivable that an individualized hearing would not be required. No such showing has been made here.

short, with respect to the point defendants have raised with regard to the U.C.C., plaintiffs have "mailed it in."

Plaintiffs have also failed to state a single common question with respect to substantive unconscionability.  Although a number of lease provisions may be "grossly unfair,"[17] the record reflects that none of the provisions are in fact "common" across the class.  That there are 367 lease forms demonstrates variability among class members' leases.  (See Breit Ex. 7; Kravic Aff. ¶ 19.)  For instance, there are differences apparent as between Avila's and Schomaker's leases with respect to property taxes and administration fees, jury and class action waivers, the LDW fee, default and termination of the lease, and the ability to cancel and/or opt-out of the lease.  Those differences coupled with defendants' evidence of myriad different lease provisions and Breit Exhibit 7 clearly show that the resulted in differing treatment of all of the provisions to which plaintiffs have referred.

Accordingly, the Court finds that there is no common question of law or fact sufficient to find "commonality" as to an unconscionability claim.

ii.   <u>Typicality</u>

Given that plaintiffs have not shown commonality and given that the "commonality and typicality requirements of Rule 23(a) tend to merge," <u>Wal-Mart</u>, 131 S. Ct. at 2551 n.5, the Court need not linger long on whether "the claims or

---

[17] The question of whether the contracts were "grossly unfair" does not constitute the type of "common" question contemplated by Rule 23(a)(2).  Indeed, the Supreme Court found that it is not.  <u>See</u> <u>Wal-Mart</u>, 131 S. Ct. at 2551 (a common question is not that all class members "suffered a violation of the same provision of the law.").

27

defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3).

There is such variability between the different leases, as well as specifically between Avila's and Schomaker's respective leases, that Avila and Schomaker are not "typical" of the class. As discussed above, there are 367 lease forms into which the putative class members entered with various defendants. Those forms vary from two to seven pages and contain various combinations in the lease terms. (See generally Breit Decl. Ex. 7.) Avila and Schomaker have each only executed one version of the contract--and each a different version. Although the terms may be similar in terms of their subject matter (e.g., "taxes," "insurance"), the lease provisions vary widely as to the actual terms imposed upon the lessees. Thus, Avila's and Schomaker's lease provisions are not themselves similar enough to demonstrate that their leases are even "typical" of the other's, and in light of the fact that there are 365 other versions of the leases, typicality is lacking on the question of substantive unconscionability.

The same is true with respect to procedural unconscionability. Avila and Schomaker's experience are not "typical" of the other's--that is underscored by the fact that Schomaker ultimately opted out of her lease whereas Avila did not. That variability alone precludes a finding that plaintiffs have demonstrated typicality by a preponderance of the evidence.

iii.   <u>Adequacy</u>

In assessing adequacy, the Court must determine whether "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4).  An "adequate" class representative is one that does not have conflicts of interest with other members of the class.  See <u>Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.</u>, 222 F.3d 52, 60 (2d Cir. 2000) (Rule 23(a)(4) test for adequacy of representation entails inquiry into whether "plaintiff's interests are antagonistic to the interest of other members of the class.").  For much the same reasons discussed above in relation to commonality and typicality, plaintiffs cannot meet the adequacy requirement of Rule 23(a).

The variations in lease arrangements necessarily mean that different plaintiffs will have had different options and may be seeking redress in different ways, for different alleged wrongs.  For instance, it may be that a lessee who paid LDW was able to obtain replacement equipment when needed, and believes that the LDW payments were money well spent.  A different lessee may have entered into a contract which, despite the high fees, meets his or her wants or needs and he or she would not be pleased to have the contract voided--<u>e.g.</u>, a lessee with an opt-out/renegotiation provision may have been able to obtain a version of a provision that he or she cares about, and as to him or her, the contract may be entirely acceptable as a result.  It may be that Avila wants to void his contract, but Class Member B may not.  In addition, Schomaker, has already cancelled her contract and may be seeking redress in an entirely different way from Avila let alone other

29

members of the class.  Thus, because Avila and Schomaker's interests are not even

adequately aligned as to each other, they cannot be said to adequately represent the

interests of the class.

iv.   <u>Rule 23(b)(3): Predominance</u>

For all of the reasons that plaintiffs cannot show that there is a single

common question of law or fact, they fail to meet the predominance requirement.

As set forth above, as to the very provisions to which plaintiffs point as

unconscionable there is wide variability.  Those plaintiffs who believe they are

paying an appropriate amount for their contracts and who received verification calls

that were recorded reiterating the amount, are situated differently from those who

do not hold such a belief and who did not receive such a call.  Similarly, those who

did not pay the LDW because they provided proof of insurance or others who

benefitted from the LDW because of replacement equipment, are all situated

differently from one another and from those who may have paid LDW.  Those who

paid LDW based on contractual language such as that in the Avila contract are

subject to a different inquiry than others who contracts had different language (<u>e.g.</u>,

Schomaker, who then called a Leasing Defendant regarding that provision).

In terms of taxes, different leases had different disclosure regarding the

amount to be collected for taxes and administrative fees.  Such differences do not

allow individual questions as to the unconscionability of such questions to

predominate.

30

In short, the uncontradicted variability in plaintiffs'--and putative class members'--leases defeats predominance.  Thus, even if plaintiffs were able to meet the Rule 23(a) requirements, they cannot satisfy Rule 23(b)(3)'s predominance requirement.  Class certification under such circumstances is improper.

B.    Conversion

Plaintiffs only make the briefest reference to their conversion claim in their motion for class certification.  (See Pls. Mem. at 26, 29.)  Apart from list a potential common questions that could support a conversion theory (e.g., "Whether withdrawals from plaintiffs' bank accounts for the charges at issue were ever authorized" (id. at 29)), they never discuss how Avila and Schomaker's respective conversion claims are typical of other class members'.  Indeed, they did not adduce any proof demonstrating that either named plaintiff was even subject to conversion, let alone that any conversion to which they may have been subject is typical of other class members.  And they fail to even mention the conversion claim when referring to the predominance requirement.

Instead, it is clear that based upon plaintiffs' own assertions in their Amended Complaint, whether or not some or all defendants "took" any unauthorized sums from any plaintiff is a highly individualized inquiry.  Compare, for instance, the allegations in the Amended Complaint referring to amounts Avila realized he alleges he had been overcharged during the lease term, approximately $30 per month more than he thought he should be paying (Avila Am. Compl. ¶ 70), to the allegations regarding how much and when Schomaker asserts amounts were

31

withdrawn from her account--which allegedly occurred after she had terminated her leasing arrangement (id. ¶¶80-82).  In addition, the defendants alleged to have withdrawn the funds from Avila and Schomaker's accounts were different: MBF Leasing, LLC in the case of Avila and TMG (as to whom this action is stayed) and LFG in the case of Schomaker.  (Id. ¶¶ 70, 83, 84.)

Because plaintiffs fail to meet the typicality, adequacy, and predominance requirements of Rule 23 for their conversion claim, the Court cannot certify a class on this claim.

IV.    CONCLUSION

For all of the reasons set forth above, plaintiffs' motion for class certification is DENIED; plaintiffs' motion for appointment of class counsel is DENIED as moot; and plaintiffs' motion to amend is DENIED.

In addition, defendants' motion to strike is DENIED as moot.

The Clerk of the Court is directed to terminate the motions in 10 Civ. 6052 at ECF Nos. 101 & 111 and in 11 Civ. 8125 at ECF Nos. 77 & 87.


SO ORDERED:

Dated: New York, New York
        December 14, 2012


_____
           Katherine B. Forrest
UNITED STATES DISTRICT JUDGE